COMMONWEALTH *vs.* DANILO LOPES.

Suffolk. April 10, 2009. - October 6, 2009.

Present: MARSHALL, C.J., SPINA, COWIN, CORDY, & GANTS, JJ.

*Practice, Criminal,* Motion to suppress, Findings by judge, Voluntariness of
confession, Instructions to jury, Capital case. *Threshold Police Inquiry.*
*Arrest. Constitutional Law,* Search and seizure, Reasonable suspicion,
Admissions and confessions, Probable cause, Waiver of constitutional
rights, Investigatory stop. *Search and Seizure,* Motor vehicle, Threshold
police inquiry, Reasonable suspicion, Probable cause. *Waiver. Joint
Enterprise.*

A trial court judge hearing a criminal defendant's pretrial motions to suppress
evidence correctly concluded that reasonable suspicion supported police
officers' initial stop of a motor vehicle driven by the defendant, where the
Commonwealth's evidence established both the indicia of reliability of a
police radio broadcast directing the officers to make an investigatory stop
of the vehicle, as well as the particularity of the description of the vehicle
[155-159]; further, where the defendant and a passenger were required to
leave the vehicle because there was a reasonable basis to believe that they
were armed and dangerous, the officers, who had yet to conduct a protec-
tive sweep of the vehicle, were justified in entering it for the limited
purpose of retrieving the defendant's identification, and there was no basis
to suppress either the identification or one officer's observation of cash
made while retrieving it [159-161]; finally, where probable cause sup-
ported a subsequent warrant to search the impounded vehicle, the judge
did not err in denying the defendant's motion to suppress items seized
from the vehicle during the execution of the warrant [164-165].
A trial court judge did not err in denying a criminal defendant's pretrial mo-
tion to suppress statements made in response to questioning at a police sta-
tion, where the defendant was not in custody at the time he made the state-
ments, and thus the police (who nevertheless advised the defendant of his
rights, which he waived) were under no obligation to refrain from questioning
the defendant; further, an officer properly seized cash in plain view after
the defendant removed it from his pocket during questioning, where, in the
circumstances, the officer had probable cause to believe that the cash was
contraband or evidence of a crime. [161-164]
At a criminal trial, no error arose from the admission in evidence of the
defendant's confession to police, where the Commonwealth met its burden
of demonstrating that the defendant's waivers of his rights were know-
ingly, intelligently, and voluntarily made [165-167], and where the totality
of the circumstances demonstrated that the defendant's confession was
voluntary [167-168].

There was no merit to a criminal defendant's claim that he was denied fair
and reasonable notice of the nature of the crime charged, or that he was
prejudiced by a joint venture instruction. [168-170]


INDICTMENTS found and returned in the Superior Court Depart-
ment on June 26, 2001.

Pretrial motions to suppress evidence were heard by *Christine
M. McEvoy*, J., and the cases was tried before *Margot Botsford*,
J.

*Esther J. Horwich* for the defendant.

*Macy Lee*, Assistant District Attorney, for the Commonwealth.

GANTS, J. On February 16, 2005, a jury convicted the defend-
ant of felony-murder in the first degree, armed robbery, and il-
legal possession of a firearm. Represented by new counsel on ap-
peal, the defendant claims error in the denial of his various motions
to suppress statements he made to the police and to suppress
evidence seized from his person and the van he was driving
shortly after the murder. The defendant also claims that the trial
judge (who was not the motion judge) erred in allowing the jury
to convict him on the theory of felony-murder by joint venture
when that theory had not been presented to the grand jury. We
reject the defendant's claims and find no basis to exercise our
authority pursuant to G. L. c. 278, § 33E, to order a new trial or
to reduce the defendant's murder conviction to a lesser degree of
guilt. Accordingly, we affirm the defendant's convictions of
felony-murder and illegal possession of a firearm. Because
armed robbery was the predicate felony for the defendant's murder
conviction, we vacate as duplicative his armed robbery convic-
tion and dismiss the underlying indictment.[1] See *Commonwealth
v. Gunter*, 427 Mass. 259, 275-276 (1998) ("When a murder
conviction is based on a felony-murder theory, the underlying
felony, whatever it may be, is always a lesser included offense
and the conviction for that felony, in addition to the conviction of
murder, is duplicative").

*Facts.* The Commonwealth presented the following evidence

---

[1] The armed robbery conviction had been placed on file. Nonetheless, it is
proper that the conviction be vacated and the indictment be dismissed. See
*Commonwealth* v. *LeBeau*, 451 Mass. 244, 263 n.20 (2008).

at trial. Jorge Fidalgo (victim) was a well known member of the Cape Verdean community in Boston. See note 3, *infra*. He and his wife owned the F and T Davey Supermarket (Davey's Market), a convenience store located on the corner of Dudley and Clarence Streets in the Roxbury neighborhood of Boston, and the victim cohosted a radio program for the Cape Verdean community.

Each morning, the victim's wife would divide the cash derived from the store's operation in packets according to denomination and wrap a brown paper band around each packet. The victim would list checks and WIC[2] vouchers on deposit slips and bind them together with a rubber band. The victim would then drive his teal-colored minivan to two banks where he had accounts to deposit the money and checks.

On the morning of April 23, 2001, the victim and his wife arrived at Davey's Market at 8 A.M. and, because their customary parking place in front of the store was occupied by another vehicle, the victim parked his minivan on Clarence Street. Around 9:45 A.M., the victim's wife gave him two brown bags containing three bundles, which included cash deposits totaling approximately $5,125, as well as checks and WIC vouchers, and the victim left the store to make his customary deposits at the banks.

At approximately 9:50 A.M., officers of the Boston police department, responding to a 911 call of a shooting, arrived at 47 Clarence Street. The victim's minivan was stopped in the middle of the street with the engine still running. The victim was seated in the driver's seat, slumped toward the middle of the vehicle, with a gunshot wound behind his left ear. The victim was transported by ambulance to a Boston hospital where he was pronounced dead a few hours later.

The police spoke with an eyewitness, Antonio Fidalgo (a cousin of the victim),[3] who had discovered the victim. Minutes before the shooting, Fidalgo had seen a long brown van[4] with

---

[2]"WIC" is an acronym for "Women, Infants, and Children," a Federal special supplemental nutrition program for women, infants, and children.

[3]Because we refer to Jorge Fidalgo as the victim, we shall refer to Antonio Fidalgo by his last name.

[4]The van is described alternatively throughout the record as "brown" or "burgundy." We find no remarkable difference between these descriptions; the record contains photographs indicating that the color of the van was closer to burgundy but, depending on the lighting, could look like a deep reddish shade of brown.

tinted windows and a Cape Verdean flag hanging from the interior rear view mirror parked in front of 47 Clarence Street. He saw at least two men inside, one in the driver's seat wearing what he described as a round "Jamaican hat," and another man moving around in the back seat area. The van was gone when he returned to the street and found the victim.

At approximately 11 A.M., a report was broadcast over the Brockton police radio asking police to be on the lookout for a brown van with tinted windows and a Cape Verdean flag in the rear with respect to a Boston homicide.[5] After hearing the police broadcast, a Brockton school police officer working a construction detail on Warren Avenue in Brockton observed a van that he thought matched the broadcast description stopped next to him in traffic. He radioed for assistance, and within minutes, Brockton police officers arrived at the scene. One officer, with his gun drawn, approached the driver's side of the van (which was still stopped in the middle lane of Warren Avenue) and asked the driver (the defendant) whether he had just come from Boston. The defendant replied in the affirmative. The defendant and Isaiah Semedo then were ordered out of the van, handcuffed, and pat frisked for weapons (none was found). Two officers entered the van, one to retrieve the defendant's identification and the other to ensure that no third person was concealed inside. The officers discovered a gray velour jacket and a denim vest in the back of the van. Cash was seen in one pocket of the jacket. A wallet containing the defendant's driver's license was retrieved from one pocket of the vest.

The defendant and Semedo were uncuffed and informed that they were not under arrest. They were asked if they would stay until Boston police detectives could question them, and they agreed to do so. Boston police officers arrived shortly thereafter, accompanied by Fidalgo. Fidalgo identified the van as the one

[5]Officer Stephen Ridge of the Boston police department was not initially involved in the investigation but heard over the Boston police radio a broadcast instructing officers to be on the lookout for a large brown van with tinted windows and a Cape Verdean flag hanging from the rear view mirror. He provided that information to a detective he knew in Brockton, a city with a large Cape Verdean population, who passed it on to a dispatcher to be radioed to Brockton police officers. Through some miscommunication, the Brockton dispatcher described the Cape Verdean flag as being "in the back," rather than hanging from the rear view mirror.

he had seen parked in front of 47 Clarence Street prior to his cousin's shooting. He was, however, unable to identify the defendant and Semedo as the individuals who had been in the van. The van was impounded and towed to the Brockton police station lot. Neither the defendant nor Semedo was arrested, but $175 was taken from the defendant.

Boston police officers applied for and obtained a warrant to search the impounded van, and the search was executed on April 24. In the van, in addition to the velour jacket and denim vest, police officers discovered $2,006 in cash and brown paper "counting bands."[6] The vest had a wallet in one pocket and a white glove in another. Three other white gloves were found in the van.

At 9 A.M. on April 25, the defendant, accompanied by his father, entered the Brockton police station and informed police that he wanted to turn himself in. He was handcuffed and escorted to an interview room, where he received Miranda warnings and waived his rights. The defendant was crying and sullen, but had no difficulty understanding the Miranda warnings, and he did not appear to be under the influence of drugs or alcohol. The defendant removed $2,000 from his pocket, placed it on a table in front of him, and stated that the money belonged to the victim. Officers from the Boston homicide unit arrived at the Brockton station shortly thereafter. The defendant again was read, and waived, his Miranda rights. The officers spoke with the defendant without recording their discussion, and then conducted a formal interview, which was tape recorded and played for the jury.

In the tape-recorded interview, the defendant admitted that he and Semedo had met a week prior to the day of the murder and devised a plan to rob the victim. The plan was for the defendant to park the van in front of Davey's Market early in the morning, so that the victim could not park his minivan in his usual spot. Semedo knew that the victim always counted the money in the morning and that the victim then would take the money to the bank. Semedo wanted to rob the victim but needed the defendant's help to carry out the robbery because the victim knew Semedo (and, presumably, did not know the defendant).[7]

---

[6]The victim's minivan also was searched. Inside a brown paper bag between the driver seat and the front passenger seat, an unspecified amount of cash was found bound together with paper counting bands.

[7]The defendant's father testified at a voir dire that the victim was his best

The defendant said that, on the morning of April 23, the defendant drove the van, which he had borrowed from a friend, to Davey's Market, and picked up Semedo, who was waiting for him outside the market. They parked the van in front of Davey's Market and watched for the victim to emerge. Semedo sat in the driver's seat of the van. The defendant stayed out of sight in the back of the van. When the victim left the store, Semedo told the defendant to get out of the van, and Semedo drove the van and stopped at the stop sign on Clarence Street, blocking the street. When the victim's minivan stopped behind the van driven by Semedo, the defendant approached the driver's window of the minivan, pointed a gun at the victim's neck, and demanded that he hand over the bag. The victim handed him one bag, and reached for another bag but did not give him the second bag. Instead, the victim moved his hand toward the gun, which went off. The defendant ran straight to the van, and Semedo drove the van to the highway, where the defendant emptied the gun of its remaining bullets and threw them out the window, along with the paper bag and the checks found inside the bag. They drove to a junk yard in Brockton, where they counted the money and Semedo gave the defendant $2,175; the defendant hid $2,000 in his boots.[8]

The defendant told police that the gun used in the murder belonged to him and was buried in his aunt's yard in Brockton. Although the defendant initially gave the wrong address for his aunt's home, he provided a rough sketch of her house and yard. Later that day police recovered, pursuant to a search warrant, a .38 caliber handgun from the yard of 74 Otis Street. Forensic testing matched the handgun to the spent bullet recovered from the victim's skull by the medical examiner.

The sole witness for the defense, Jaamaille Williams, testified that he had a conversation with Semedo in March, 2003, in the Cambridge jail in which Semedo bragged that he had shot his

---

friend; he did not testify before the jury. The victim's wife testified that the defendant's father was one of her husband's best friends, but she did not know the defendant. There is no evidence whether the defendant recognized the victim, or whether the victim recognized the defendant, during the armed robbery.

[8]Because the Commonwealth offered the defendant's confession in evidence, Semedo's motion to sever was allowed by the motion judge and he was tried separately. He was convicted of murder and armed robbery in April, 2004, before the defendant's trial, and his appeal has been entered in this court.

codefendant's uncle or nephew, who owned Davey's Market. Williams said that Semedo had claimed he and the victim had a confrontation before the robbery, and Semedo killed him to get revenge. Semedo told Williams that Semedo had split with his codefendant between $10,000 and $15,000 taken from the victim.

*Discussion.* The defendant claims that the motion judge erred in denying his various motions to suppress, and that the trial judge erred in finding the defendant's confession to be voluntary beyond a reasonable doubt and in allowing the jury to convict the defendant on a joint venture theory. We address each claim of error in turn.

1. *Motions to suppress.* The defendant filed several motions to suppress. Initially, he sought suppression of the evidence seized by the Brockton and Boston police on April 23, 2001, and all evidence seized from the van, pursuant to the execution of the search warrant, on April 24. He next filed a motion to suppress statements he made to police on April 23 and April 25. Finally, the defendant moved to suppress Fidalgo's identification of the van as the one he had observed parked at 47 Clarence Street minutes before the murder. After a five-day evidentiary hearing, the motion judge made detailed findings of fact and conclusions of law.

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). All of the judge's relevant findings of fact, which we will set forth in discussing each motion to suppress, are supported by the evidence presented at the suppression hearing, and we accept them. Using her factual findings as a backdrop, we now independently review the judge's ultimate conclusions of law pertaining to each issue raised by the defendant on appeal.[9]

a. *The stop of the van on April 23.* The defendant claims that the initial stop of the van was not supported by reasonable suspicion as required in *Terry* v. *Ohio*, 392 U.S. 1 (1968). The motion judge found that it was, based on the following findings of fact.

---

[9]The defendant does not challenge on appeal the denial of his motion to suppress Fidalgo's identification of the van.

After responding to a 911 call and finding the victim slumped in his van, Boston police officers learned that the victim had just left his store to go to the bank to make a deposit. Fidalgo told the officers that he had seen a big brown van parked behind his own vehicle on Clarence Street at approximately 9:40 A.M. Fidalgo described the van as resembling a Dodge Ram 350 in length and style with a Cape Verdean flag hanging from its rear view mirror and with tinted windows. Fidalgo reported seeing two individuals in the van. He described the driver as a black male, possibly Cape Verdean, with a dark complexion and a skinny face, wearing a "Jamaican" hat. He observed a second person in the rear of the van but could not describe that person because of the tinted windows. Fidalgo reported that he went inside a house at 47 Clarence Street for a period of approximately ten minutes, and when he came out saw that the brown van was gone and his cousin, who appeared to be dead, in a blue minivan.

After hearing the description of the van broadcast over the Boston police radio, Officer Stephen Ridge of the Boston police department contacted by telephone Detective Joseph Cummings of the Brockton police department,[10] and informed him of a shooting that involved a big brown van with tinted windows and a Cape Verdean flag operated by a black male, possibly Cape Verdean. As a result of the call, the following message was broadcast to Brockton police officers:

> "Brockton cruisers, be on the lookout for dark brown tinted van. Cape Verdean flag in the back of it. It's the only information we have. Homicide in Boston today by handgun, dark brown tinted van, Cape Verdean flag in the back. Stop and hold. Use caution."

At approximately 11:25 A.M., Officer Robert J. Smith of the Brockton school police department,[11] who was working a construction detail, observed an older model brown Dodge Ram 350 with tinted windows stopped in traffic at a red light. Officer Smith approached the van from the side, circled it, and in doing

---

[10]Officer Ridge knew Detective Joseph Cummings as a fellow member of a United States Marshal's task force responsible for apprehending fugitives.

[11]Officer Robert J. Smith testified that Brockton school police officers have the same authority as Brockton city police officers, including the power to arrest.

so observed a Cape Verdean flag hanging from the rear view mirror. He also observed two males sitting in the front seats. Using his police radio, he requested assistance and, within a minute, his brother, Officer Kevin Smith (who was working a nearby construction detail), arrived at the scene. Officer Robert Smith had drawn his weapon and pointed it toward the headlight area of the van. Officer Kevin Smith drew his weapon as he approached the van but reholstered it as he reached the driver's door. He opened the door and asked the driver (who was the defendant) whether he had just come from Boston. The defendant answered, "Yes." Officer Kevin Smith then guided the defendant out of the van, pat frisked him for weapons, and handcuffed him. Officer Robert Smith then asked the van's passenger (who was Semedo), to get out of the van, and pat frisked and handcuffed him as well. No property was seized from either the defendant or Semedo at this time. The men were escorted to a nearby sidewalk, where they sat down. In approaching the men, drawing their weapons, giving exit orders, and handcuffing the men, both officers were acting out of concern for their safety and the safety of others, believing that the van and the individuals probably had been involved in a homicide.

We conclude that the investigatory stop in this case occurred when Officer Robert Smith drew his weapon and pointed it toward the already stopped van. See *Commonwealth* v. *Willis*, 415 Mass. 814, 819-821 (1993), and cases cited. We agree with the motion judge that the investigatory stop was justified by a reasonable suspicion, based on reasonable inferences from specific and articulable facts, that the occupants of the van had committed a homicide in Boston earlier that day. See *Commonwealth* v. *Alvarado*, 427 Mass. 277, 280-281 (1998); *Commonwealth* v. *Lyons*, 409 Mass. 16, 18-19 (1990).

When, as here, a police radio broadcast directs officers to make an investigatory stop of a motor vehicle, the stop is lawful only if the Commonwealth establishes both the indicia of reliability of the transmitted information and the particularity of the description of the motor vehicle. See *Commonwealth* v. *Riggieri*, 438 Mass. 613, 615-616 (2003); *Commonwealth* v. *Mercado*, 422 Mass. 367, 371 (1996); *Commonwealth* v. *Willis*, *supra* at 818. To establish that the transmitted information bears adequate indicia of reliability, the Commonwealth must show

the basis of knowledge of the source of the information (the basis of knowledge test) and the underlying circumstances demonstrating that the source of the information was credible or the information reliable (veracity test). See *Commonwealth* v. *Upton*, 394 Mass. 363, 374-375 (1985) (rejecting "totality of the circumstances" test set forth in *Illinois* v. *Gates*, 462 U.S. 213 [1983], and concluding that "principles developed under *Aguilar* v. *Texas*, 378 U.S. 108 [1964], and *Spinelli* v. *United States*, 393 U.S. 410 (1969), if not applied hypertechnically, provide a more appropriate structure for probable cause inquiries under art. 14" of Massachusetts Declaration of Rights). See also *Commonwealth* v. *Alvarado, supra* at 281. "Because the standard is reasonable suspicion rather than probable cause, a less rigorous showing in each of these areas is permissible." *Commonwealth* v. *Lyons, supra* at 19. See *Commonwealth* v. *Riggieri, supra* at 616 n.4. "Independent police corroboration may make up for deficiencies in one or both of these factors." *Id.* at 615-616, quoting *Commonwealth* v. *Barros*, 435 Mass. 171, 176 (2001).

Here, the source of the information was Fidalgo, who had identified himself to the police and had seen the van in front of Davey's Market minutes before, but not minutes after, his cousin was shot. Because the basis of his knowledge was his own personal observation, he gave his true name to the police, and he was a cousin of the victim, Fidalgo's information more than satisfied both the basis of knowledge test and the veracity test. See *Commonwealth* v. *Riggieri, supra* at 616-617 (dispatch based on information provided by cellular telephone caller who was off-duty reserve police officer whom police dispatcher reasonably could have found to be reliable); *Commonwealth* v. *White*, 422 Mass. 487, 496-497 (1996) (radio broadcast based on police interviews with witnesses at scene of crime found to be reliable); *Commonwealth* v. *Bowden*, 379 Mass. 472, 477 (1980) (percipient witnesses regarded as reliable); *Commonwealth* v. *Riggins*, 366 Mass. 81, 85 (1974) (radio broadcast based on information given to police officer by acting manager of bank that was robbed, who had made personal observations, and by bank customer who had been present during robbery found reliable).

While the information furnished by Fidalgo was reliable, the

defendant contends that, at best, it showed simply the presence of the van near the scene of the homicide and did not establish reasonable suspicion that the two men in the van participated in the homicide. Fidalgo's description of the van and its occupants certainly did not eliminate the possibility that their presence at the scene of the homicide was an innocent coincidence, but it was enough to establish a reasonable suspicion of their involvement. There was no apparent innocent reason why the driver would be sitting in the van, with his head down, and another individual would be in the rear passenger area (rather than the front passenger seat) minutes before the homicide, and why the van would have departed moments later. The victim's minivan was stopped in the middle of the road, with its engine running when Fidalgo saw it. This observation permitted the reasonable inference that the victim was surprised by his assailants (because he remained in the driver's seat) and that his minivan had been stopped when he was shot (because the van did not crash into a parked vehicle or the curb). Each of these inferences reasonably support the suspicion that the van was used to block the minivan and to enable the assailants to get away quickly from the scene of the crime.

To establish the particularity of the description of the van, the Commonwealth must show that the description provided sufficient detail to allow the police officer relying on the radio transmission reasonably to suspect that a motor vehicle matching the description was occupied by a person or persons who committed the crime under investigation. See *Commonwealth* v. *Riggins, supra* at 87. Cf. *Commonwealth* v. *Mercado, supra* at 371; *Commonwealth* v. *Cheek,* 413 Mass. 492, 496 (1992). The description need not be as singular as a registration plate number, but it must not be so broad as to fit a large number of motor vehicles in the area where the stop occurred. See *Commonwealth* v. *Riggins, supra* at 83, 87 (radio broadcast that two males in red vehicle were heading south on Route 83 after committing bank robbery in East Longmeadow provided sufficient detail that vehicle stopped might have been involved in robbery when stop occurred on Route I-91 at time consistent with travel time from scene of robbery). But see *Commonwealth* v. *Cheek, supra* ("description of the suspect as a 'black male with a black ¾ length goose'

could have fit a large number of men who reside in the Grove Hall section of Roxbury, a predominantly black neighborhood of the city"). We have no hard and fast rule governing the required level of particularity; our constitutional analysis ultimately is practical, balancing the risk that an innocent person whose vehicle matches the description will be needlessly stopped with the risk that a guilty person will be allowed to escape. See *Commonwealth v. Riggins, supra* at 87 (finding proper basis to stop vehicle "in a constitutional, as well as a practical, sense").

Here, significant details given by Fidalgo — the van's make, the two occupants, the description of the driver, the time of the homicide — were not transmitted to Brockton police. Officer Robert Smith had to determine whether there was reasonable suspicion that the van stopped near him was the van involved in the homicide based only on its color, its tinted windows, and the Cape Verdean flag hanging from the inside rear view mirror. We conclude that the probability that a reddish brown van with tinted windows and a Cape Verdean flag was the van involved in the homicide was sufficiently high that Officer Robert Smith was justified in stopping the van.[12]

We recognize that the Cape Verdean flag in the defendant's van was hanging from the rear view mirror, not "in the back," as described in the broadcast to Brockton police. We conclude that the difference was not material. An objectively reasonable police officer would not have allowed the van to pass simply because the Cape Verdean flag hung from the inside rear view mirror rather than the "back" of the van. See *Commonwealth v. Mercado,* 422 Mass. 367, 370 n.1 (1996) ("While it is appropriate for the judge to consider the existence of inconsistent information, inconsistencies alone do not foreclose the possibility of reasonable suspicion"). Reasonable suspicion does not require "a full match-up of all parts of the description." *Commonwealth v. Emuakpor,* 57 Mass. App. Ct. 192, 198 (2003), quoting 2 W.R. LaFave, Search and Seizure § 3.4 (c), at 241 (3d ed. 1996), and 4 W.R. LaFave, Search and Seizure § 9.4 (g), at 201 (3d ed. 1996). Police "must be allowed to take account of the

---

[12]While there was evidence that Brockton has a substantial Cape Verdean population, there was no evidence that (and no reason to believe) Cape Verdean flags were commonly affixed to motor vehicles.

possibility that some descriptive facts supplied by victims or witnesses may be in error." *Commonwealth* v. *Emuakpor*, *supra*, quoting 2 W.R. LaFave, *supra*, and 4 W.R. LaFave, *supra*.[13]

For these reasons, we conclude that Officer Robert Smith had reasonable suspicion to stop the van even before Officer Kevin Smith obtained confirmation from the defendant that he had just come from Boston. Because Officer Robert Smith reasonably suspected, based on the Brockton broadcast, that the occupants of the van had earlier that day committed a homicide with a handgun, he and his brother also had an objectively reasonable basis to believe that the men could be "armed and dangerous." *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). The officers acted cautiously and permissibly, in drawing their guns, briefly, as they ordered the defendant and Semedo out of the van and placed them in handcuffs. See *Commonwealth* v. *Willis*, 415 Mass. 814, 821 (1993) ("Constitutional principles do not require the police to approach a person who is reasonably suspected of being armed with a loaded, stolen handgun and reasonably believed to have engaged in violent criminal conduct without taking precautions against the use of that weapon against them").

b. *The initial entry into the van.* The defendant contends that the police were not justified in entering the van during the stop, and therefore the police observation of a substantial amount of cash in the van and the defendant's identification should have been suppressed. The motion judge found that the entry was lawful, as was the observation of the cash and the defendant's identification.

In her findings of fact, the judge found that several other Brockton police officers, including Detective Cummings, arrived shortly after the defendant and Semedo were removed from the van. Detective Cummings asked the defendant for identification, and the defendant responded that his wallet was in a coat inside the van. Detective Cummings then directed Officer Scott Besarick to retrieve the wallet. Officer Besarick opened a passenger side door of the van, observed a coat lying on the first seat behind the front passenger seat, and looked in the pockets of the coat for the defendant's wallet. He felt a "bundle," removed

---

[13]Nor, for the reasons discussed in note 4, *supra*, do we find it material that the van's actual color may have been burgundy or maroon, rather than brown.

it to look for the identification, and discovered that it was a substantial amount of cash. He reported to Detective Cummings what he had discovered, and Detective Cummings directed Officer Besarick to leave the cash there, not to touch anything else, and to leave the van alone. Officer Besarick did not return to the van.

Close in time to when Officer Besarick entered the van, Detective Michael Schaaf asked another officer whether the van had been checked to ensure that no one else was in it. On learning that it was unknown whether the van had been checked for others, Detective Schaaf entered the van through the side door, looked at each row of seats, and discovered no one. As he was leaving the van, he observed a wallet protruding from the pocket of a denim jacket on one of the rear rows of seats. Detective Schaaf removed the wallet and gave it to Detective Cummings, who then was able to verify the identity of the defendant.

A police officer who conducts a *Terry* stop of a motor vehicle may ask the driver for his license and registration to verify his identity and to ensure that he is properly licensed. See *Commonwealth* v. *Feyenord*, 445 Mass. 72, 76 (2005), cert. denied, 546 U.S. 1187 (2006); *Commonwealth* v. *Lantigua*, 38 Mass. App. Ct. 526, 527-528 (1995). See also *Commonwealth* v. *Torres*, 424 Mass. 153, 157-158 (1997). When, as here, the driver tells the officer that his identification is inside the vehicle, the police officer is not obliged to forgo the inquiry. Generally, the officer may simply direct the driver to retrieve his identification from the vehicle. However, when, as here, the driver and his passenger have been required to leave the vehicle because there was a reasonable basis to believe that they were armed and dangerous, and when the vehicle had yet to be protectively swept for possible weapons, the police officer was not required to choose between risking his safety and retrieving the identification. See *Commonwealth* v. *Robbins*, 407 Mass. 147, 151-152 (1990) (police officers are "not required to gamble with their personal safety"). Rather, he may lawfully enter the vehicle (or cause another officer to enter) for the limited purpose of retrieving the defendant's identification. See *Commonwealth* v. *Lantigua*, *supra* at 528-529. See also *Commonwealth* v. *Pagan*, 440 Mass. 62, 67-68 (2003) (where burglary suspect tells police that his identification is in backpack, police either had to retrieve identification them-

selves or confirm that there were no weapons or weapon-like objects in backpack so that they could safely hand it back to defendant for his retrieval of identification).

Here, the motion judge found that Officer Besarick entered the van for that limited purpose and discovered the cash while looking for the identification. Because Officer Besarick was entitled to be inside the vehicle looking for the defendant's wallet, there is no basis to suppress his observation of cash made while seeking to accomplish that purpose.

In these circumstances, it also would be lawful to conduct a protective sweep of the van limited to a search for weapons. See *Commonwealth* v. *Robbins, supra* at 152; *Commonwealth* v. *Almeida*, 373 Mass. 266, 272 (1977). The same concern for the safety of police officers justifies, in appropriate circumstances, a protective sweep of the van limited to a search for other suspects. While a protective sweep is generally unnecessary in a traffic stop because there usually are no objectively reasonable grounds to believe that another suspect may be hidden in the vehicle, we find that there were reasonable grounds here to justify a protective sweep, because the vehicle was a large passenger van with four rows of seats, the Brockton police on the scene could not be certain that only two individuals had participated in the homicide, and the defendant and Semedo had been quickly removed from the van, with no protective sweep yet conducted. See generally *Commonwealth* v. *Peters*, 453 Mass. 818, 823-824 (2009). Because Detective Schaaf saw the defendant's wallet protruding from a denim jacket in the van and knew that the police were looking for (and had not yet found) the defendant's identification, it was lawful for him to bring the wallet to Detective Cummings to provide him with the needed identification.

c. *The interview of the defendant at the Brockton police station on April 23.* The defendant claims error in the denial of his motion to suppress statements made to police at the Brockton police station on April 23 and to suppress the money taken from him that day. The motion judge denied both claims. There was no error.

In her findings of fact, the motion judge found that, when Brockton Sergeant Bruce Zeidman arrived at the scene of the stop, he administered Miranda warnings to the defendant and

Semedo. One of the two men said nothing, and the other indicated that he had nothing to say, but Sergeant Zeidman could not remember which man gave which response. No questioning occurred at this time.

The Boston police were notified of the van's stop, and Sergeant Detective Daniel Coleman of the Boston police homicide unit directed Detective Cummings by telephone to remove the handcuffs from the defendant and Semedo and to tell the men that they were not under arrest. He instructed Detective Cummings to ask each man whether he would be willing to stay and wait at Warren Avenue to speak to Boston police, who were at that time on their way to Brockton. The handcuffs were removed, and the defendant and Semedo agreed to stay. The two men waited in a parking lot for the arrival of Boston police.

Fidalgo was transported to the scene by three Boston police officers. As he approached the van, Fidalgo volunteered that the van was the one he previously had seen on 47 Clarence Street. He then was asked to identify the defendant and Semedo but indicated to police that he could not.

Sergeant Detective Timothy Duggan of the Boston police department asked the defendant and Semedo whether they would go to the Brockton police station for an interview. Both agreed to do so. The two men were transported to the station in separate vehicles and were neither handcuffed nor questioned en route.

At the station, the defendant and Semedo were placed in separate interview rooms. The defendant was again read Miranda warnings and agreed in writing to waive his rights. He also agreed to allow the interview to be tape recorded. Sergeant Detective Duggan interviewed the defendant for approximately forty-five minutes. The defendant did not appear to be under the influence of drugs or alcohol, was not confused, and spoke and understood English. There was no need for an interpreter. He had access to a bathroom and water and was not restrained. He did not ask to leave or otherwise terminate the interview.

During the interview, Sergeant Detective Duggan noticed a bulge in the pocket of the defendant's pants and asked him what it was. The defendant responded that it was money and, complying with the officer's request, produced a wad of bills, mostly singles, including a packet of bills with a thin brown band around it. Sergeant Detective Duggan explained that he was

going to hold the money and gave the defendant a receipt. After the interview, Sergeant Detective Duggan informed the defendant that he was free to leave, and the defendant left the station.[14]

For purposes of this decision, we assume (without deciding) that the defendant was in custody when the Miranda warnings were read by Sergeant Zeidman, that he was the person who said he had nothing to say, and that he thereby invoked his right to silence at that time. If he had remained in custody, the police would have been obliged scrupulously to honor the defendant's invocation of his right to silence and not resume questioning until a significant period of time had passed and a fresh set of Miranda warnings had been administered. See *Michigan* v. *Mosley*, 423 U.S. 96, 103-104 (1975); *Commonwealth* v. *Brant*, 380 Mass. 876, 884 (1980). This obligation derives from the requirement in *Miranda* v. *Arizona*, 384 U.S. 436 (1966), that " 'the interrogation must cease' when the person in custody indicates that 'he wishes to remain silent,' " because, "[w]ithout the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." *Michigan* v. *Mosley, supra* at 100-101, quoting *Miranda* v. *Arizona, supra* at 473-474.

We agree, however, with the motion judge's finding that the defendant was not in custody after his handcuffs were removed and he was told he was not under arrest. Once the defendant was no longer in custody and was free to leave, the obligations of the police arising from the *Miranda* decision, including the obligation to refrain from further questioning for a significant period of time after an invocation of silence, no longer applied. See *Commonwealth* v. *Galford*, 413 Mass. 364, 370-371 (1992).[15]

Even though the defendant was not in custody at the police

---

[14]The defendant made various statements during the course of his interview with the police, but the Commonwealth did not offer any of these statements at trial. Sergeant Detective Timothy Duggan also seized a watch that the defendant was wearing during the interview, but the Commonwealth did not offer the watch in evidence at trial or make any mention of it. Consequently, we focus only on the seizure of the cash, because that was the only evidence derived from the interview that was admitted at trial.

[15]In *Commonwealth* v. *Galford*, 413 Mass. 364, 370-371 (1992), we concluded that, when a defendant is released from custody, the police may renew the questioning of an accused who had invoked his right to counsel

station, he was still advised of his Miranda rights and waived those rights. Once he removed the wad of cash from his pocket and showed it to Sergeant Detective Duggan, the officer could seize the cash in plain view only if he had probable cause to believe the cash was contraband or evidence of a crime. We agree with the motion judge that the officer had probable cause to seize the cash. At that time, the police knew that the victim had been shot and robbed of the proceeds from the operation of his grocery store, that Fidalgo had identified the defendant's van as the van that had been present moments before the shooting and gone moments later, that a substantial amount of cash had been seen in the van, and that the thin brown band around some of the cash displayed by the defendant was consistent with the bands used to sort and count money by a business. We also agree with the motion judge that the warrantless seizure of the cash was justified in the circumstances because, to obtain a warrant, the officer would either have had to allow the defendant to leave with the money or detain the defendant for the time needed to obtain a warrant. See *Commonwealth* v. *Hinds*, 437 Mass. 54, 62 (2002).

d. *The search of the van on April 24.* The defendant claims that all of the items seized from the van during the search executed on April 24 should have been suppressed because, without the tainted evidence derived from the illegal stop, the warrant supporting the search lacked probable cause and thus was fatally defective. Because we have concluded that the stop was not illegal, we focus solely on whether the warrant was supported by probable cause.

"To establish probable cause to search, the facts contained in an affidavit, and reasonable inferences that may be drawn from

without first obtaining a valid waiver of the right to counsel. The invocation of the right to counsel must be more scrupulously honored than the invocation of the right to silence. Once an accused invokes his right to counsel, the police may not question the individual unless he initiates the communication, and the Commonwealth must then prove the voluntary, knowing, and intelligent waiver of the right to counsel beyond a reasonable doubt. *Commonwealth* v. *Rankins*, 429 Mass. 470, 473 (1999), citing *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981), and *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1044 (1983). Consequently, if an accused who has invoked his right to counsel may be questioned by police after his release from custody, a fortiori, an accused who has invoked his right to silence may be questioned by police after his release from custody.

them, must be sufficient for the magistrate to conclude 'that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.' " *Commonwealth* v. *Anthony*, 451 Mass. 59, 68 (2008), quoting *Commonwealth* v. *Walker*, 438 Mass. 246, 249 (2002). See G. L. c. 276, § 2B (affidavit "shall contain the facts, information, and circumstances upon which [the affiant] relies to establish sufficient grounds for the issuance of the warrant"). In reviewing a magistrate's finding of probable cause, only the "facts revealed on the face of the affidavit and any reasonable inferences therefrom may be considered." *Commonwealth* v. *Allen*, 406 Mass. 575, 578 (1990).

There can be no doubt that the four-page affidavit, read as a whole under standards described above, established probable cause to search the van. The affidavit described the information then known to the police, including the robbery and murder of the victim, Fidalgo's identification of the van, the stack of cash found in the coat in the van, statements made by the victim's wife that the victim had carried a large sum of money with him when he left Davey's Market that morning, and the $175 taken from the defendant during the April 23 interview, part of which was bundled in a brown paper band commonly used by businesses to count money.[16]

e. *Confession of April 25.* The defendant contends that his statements made at the Brockton police station on April 25 were the product of an invalid waiver of his Miranda rights and further contends that his confession was involuntary under the due process clause of the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Before we examine these contentions separately, see *Commonwealth* v. *Leahy*, 445 Mass. 481, 486-487 (2005), we summarize the motion judge's findings of fact. On April 25, at approximately 9 A.M., the defendant, accompanied by his father,

---

[16]The affidavit also stated that the defendant had admitted to police during the April 23 interview at the Brockton police station that he had been in Boston in the brown van that day and that he and Semedo had been together in the van all morning. The Commonwealth did not seek to introduce these statements at trial, and we do not consider them in evaluating whether there was probable cause to justify the search warrant, because there was abundant probable cause to search the van without them.

walked into the Brockton police station. The defendant's father informed a police officer that his son wanted to turn himself in. The defendant added that it was about the "thing" that happened in Boston. The officer did not understand the reference, and the defendant replied, "Yeah, I did it." The defendant was placed in handcuffs and taken upstairs. His father remained downstairs. Detective Cummings then spoke by telephone to Boston Officer Stephen Ridge to inform him what had happened.

While waiting for Boston homicide officers to arrive, Detective Cummings informed the defendant of his Miranda rights. The defendant stated that he understood the rights and signed a written waiver form. Detective Cummings and Sergeant Michael Dennehy began to question the defendant; Officer Ridge arrived later and joined them in their questioning. The defendant spoke in English, did not appear to be under the influence of drugs or alcohol, was not confused or disoriented, and appeared to understand the questions asked, as indicated by his responsive answers. Because these officers knew little about the details of the murder, their questions were limited to the location of the weapon used in the robbery and shooting.

Sergeant Detective Coleman arrived at the Brockton police station at approximately 10 A.M, with Detective Juan Torres. Sergeant Detective Coleman again advised the defendant of his Miranda rights, advised the defendant of his right to make a telephone call, and asked the defendant whether he would like to spend time with his father. The defendant again waived his rights and declined to make a telephone call, but did ask to see his father. The defendant's father was brought upstairs, and the father and son spoke privately for a few minutes.

Sergeant Detective Coleman then began a further conversation with the defendant and an audiotaped interview occurred. Our review of the tape recording confirms that the defendant could both speak and understand English. There was no indication of anything but sobriety. The defendant was oriented and understood very clearly what was occurring. He had access to water and a bathroom. There were no threats, yelling, or coercion.

(i) *Knowing and intelligent Miranda waiver.* Our initial inquiry is whether the Commonwealth has met its burden of demonstrating that the defendant was advised of his Miranda rights in a meaningful manner in a language he could comprehend. See

*Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 544, cert. denied, 537 U.S. 942 (2002). We then look to determine whether the Commonwealth has proved that the rights were knowingly, intelligently, and voluntarily waived. See *Commonwealth* v. *Hilton*, 443 Mass. 597, 607 (2005), *S.C.*, 450 Mass. 173 (2007). In doing so we give full deference to the motion judge's findings of fact, which, as stated earlier, are fully supported by the evidence in the motion hearing record. See *Commonwealth* v. *Leahy*, *supra* at 485.

The defendant was twice given complete Miranda warnings. Both times the defendant was read each right verbatim from a form, and stated that he understood each right, and signed his name to the form indicating that he understood the rights and waived them voluntarily and wished to make a statement. See *Commonwealth* v. *Magee*, 423 Mass. 381, 387 n.8 (1996) (signed waiver form, although not dispositive, constitutes evidence of voluntariness). The motion judge found that the defendant "clearly understood English [and] spoke in English." We conclude, as did the motion judge, that the defendant's waivers were knowingly, intelligently, and voluntarily made.

(ii) *Voluntariness.* The test for voluntariness of a confession is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the confession was not the result of a free and voluntary act." *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995). Among the relevant factors we consider under the "totality of the circumstances test" are "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Id.*, quoting *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

The motion judge did not make a conclusion of law as to the voluntariness of the defendant's confession. The trial judge, relying on the motion judge's findings of fact and having heard the voir dire testimony of the defendant's father, found the statements to be voluntary beyond a reasonable doubt. The

defendant contends that his statements were involuntary because he was suicidal at the time and because his father forced him to go to the police station. As to the former, the trial judge credited the defendant's father's voir dire testimony that his son threatened to kill himself after he told his father what he had done and that the father was fearful his son would do so. Suicidal ideation and threats, however, do not necessarily negate the voluntariness of a confession. See *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 555 (2001), and cases cited. The trial judge, having considered the defendant's suicidal feelings as part of the totality of the circumstances, did not err in concluding that the defendant's statements were voluntary.

As to the alleged coercion by the defendant's father, the defendant relied solely on his father's testimony to support his contention that his father forced him to confess, but, as the trial judge found, that testimony did not support an inference of coercion.[17] The trial judge found that the defendant's father advised him to go to the police because he thought that was the right thing to do, but he did not coerce or unduly pressure his son to go to the police. It was the defendant, not his father, who volunteered that he "did it," and the defendant spoke to the police alone. The trial judge found that the defendant asked to see his father during the interview simply to say again that he was sorry. While we recognize that a statement coerced by a private person, constitutionally, is as involuntary as a statement coerced by a government official, see *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680-681 (1975), cert. denied, 425 U.S. 959 (1976), we agree with the trial judge that the defendant's father did not coerce the defendant to testify. Assessing the totality of circumstances, we conclude, as did the trial judge, that the defendant's confession was voluntary.

At the conclusion of the trial, the judge provided a "humane practice" instruction to the jury pertaining to all of the defendant's statements. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 149-152, cert. denied, 457 U.S. 1137 (1982). There was no error in the admission of the defendant's confession.[18]

2. *Joint venture instructions.* There is no merit to the defend-

---

[17]The defendant did not testify at the motion hearing or at trial.

[18]The defendant also asserts that his confession was inadmissible because

ant's claim that the trial judge erred by permitting the Commonwealth to seek a conviction based on joint venture felony-murder when that theory of the crime did not appear on the face of the indictment and had not been presented to the grand jury. The indictment charging murder tracked the language in the form for a murder indictment set forth in G. L. c. 277, § 79, which provides that "such forms shall be sufficient in cases to which they are applicable." Moreover, G. L. c. 277, § 34, provides that "[a]n indictment shall not be dismissed or be considered defective or insufficient if it is sufficient to enable the defendant to understand the charge and to prepare his defense." See also G. L. c. 277, § 35 ("A defendant shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defence").

The record indicates that the grand jury were presented with the defendant's statements made on April 25 at the Brockton police station.[19] These statements more than sufficed to support the indictments under the theory that the defendant was involved in a joint venture. See *Commonwealth* v. *Tague*, 434 Mass. 510, 514 (2001); *Commonwealth* v. *Daughtry*, 417 Mass. 136, 141-142 (1994). Defense counsel was in possession of the grand jury minutes, as well as the Commonwealth's statement of the case,

only the last portion of the interrogation was tape recorded. See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 441 (2004). This argument misunderstands the holding of the *DiGiambattista* decision, which, in so far as relevant here, requires that, "[w]here voluntariness is a live issue and the humane practice instruction is given, the jury should also be advised that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt." *Id.* at 448. The failure to record, by itself, does not render a confession inadmissible.

The trial judge instructed the jury in accordance with our direction in the *DiGiambattista* decision. The defendant objected to the instruction on the ground that the judge diminished its impact by also telling the jury that "in a recent decision of August [2004], our State's highest court has expressed a preference that interrogations of defendants be recorded whenever practical." The instruction was factually accurate and proper. See *Commonwealth* v. *Garuti*, 454 Mass. 48, 53 (2009); *Commonwealth* v. *Boyarsky*, 452 Mass. 700, 710 (2008).

[19]The grand jury minutes were not made available to us in their entirety. In the defendant's brief, his appellate counsel states that the grand jury minutes "are missing from the trial file," and that "present counsel and clerk's office personnel have been unable to locate them."

which was filed in the Superior Court on June 29, 2001, and both describe evidence that the defendant and Semedo acted together in a joint venture to commit an armed robbery on the victim and that, during the course of the armed robbery, the victim was killed. The defendant cannot reasonably claim that he was denied fair and reasonable notice of the nature of the crime charged or that he was prejudiced by the joint venture instruction.[20] There was no error.

3. *G. L. 278, § 33E.* We have reviewed the entire record and find no reason to set aside or reduce, pursuant to G. L. c. 278, § 33E, the defendant's conviction of murder in the first degree. The Commonwealth presented compelling evidence that the defendant plotted with Semedo to carry out an armed robbery on the victim and that, during the commission of the robbery, the defendant shot and killed the victim. The unusual tragic circumstances in this case — the defendant killing his father's best friend and confessing to the police after having first confessed to his father — do not entitle him to § 33E relief.

*Conclusion.* The judgment and sentence on the armed robbery conviction are vacated and the underlying indictment is remanded to the Superior Court for dismissal. The defendant's remaining convictions are affirmed.

*So ordered.*

---

[20]We agree with the trial judge's observation, made to defense counsel at sidebar midway through trial: "[I]t seems to me from the get-go, this is a case involving . . . two people committing the robbery, and out of that comes a very tragic death. . . . [I]t just seems to me it's got joint venture written all over it from the get-go."