## COMMONWEALTH *vs*. MANUEL ALVARADO.

Hampden. March 2, 1998. - April 14, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Constitutional Law,* Investigatory stop, Reasonable suspicion. *Motor Vehicle,* Firearms. *Search and Seizure,* Automobile. *Evidence,* Admissions and confessions.

Police officers had a constitutionally sufficient basis, that is, reasonable suspicion, to stop a motor vehicle, to order the four occupants out and to frisk them for weapons, and then to examine the vehicle's interior for a specific type of weapon, where the police had information from a disinterested citizen, who identified himself and relayed his personal observations, that the front seat passenger in the vehicle had an apparent sawed-off shotgun in his possession, and given that likely possession of a sawed-off shotgun, by itself, discloses an imminent threat to public safety. [281-284]

A criminal case was remanded for further findings relative to whether the defendant was under arrest or in custody, and thus entitled to Miranda warnings, before he made an inculpatory statement in response to a police officer's question. [284-285]

COMPLAINT received and sworn to in the Holyoke Division of the District Court Department on March 8, 1994.

A pretrial motion to suppress evidence was heard by *William B. McDonough,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Thomas H. Townsend,* Assistant District Attorney (*Marcia B. Julian,* Assistant District Attorney, with him) for the Commonwealth.

*Thomas F. McGuire* for the defendant.

GREANEY, J. The defendant was charged in the Holyoke Division of the District Court Department under G. L. c. 269, § 10 (*a*), with carrying a firearm without having a license to do so. He filed a motion to suppress "evidence seized by the police

when they stopped and searched a motor vehicle in which the [d]efendant was a passenger," basing the motion on art. 14 of the Massachusetts Declaration of Rights and the Fourth and Fourteenth Amendments to the United States Constitution. A District Court judge held an evidentiary hearing and allowed the motion which resulted in the suppression of the handgun that is the subject of the carrying charge, as well as a statement made by the defendant in response to a question by a police officer.[1] The Commonwealth appealed, and the Appeals Court, in an unpublished decision pursuant to its rule 1:28, affirmed the order allowing the motion to suppress. *Commonwealth* v. *Alvarado*, 42 Mass. App. Ct. 1116 (1997). We granted the Commonwealth's application for further appellate review. We now vacate the order suppressing the handgun and direct that further proceedings be conducted with respect to the defendant's statement.

1. The judge found the following facts. On March 7, 1994, at 4:30 P.M., Christopher Hopewell, a paramedic employed by the Holyoke Hospital Emergency Medical Services (EMS), stood on High Street in Holyoke after responding to an emergency call, when he saw a car containing four men drive slowly past him. Hopewell noticed that a man in the front passenger seat of the car, subsequently identified as the defendant, was slumped over and holding what Hopewell described as a "foot to two foot long 'cylinder-ish' pipe which reflected light." Hopewell followed the car, and made contact with the dispatcher at the Holyoke police department by radio. Hopewell described the registration number of the car, the number of occupants, and the perception of what he saw, namely, a sawed-off shotgun.[2]

Henry Wielgosz, a Holyoke police officer on cruiser patrol at the time, heard the radio communications between Hopewell

---

[1]The defendant was also charged with the unlawful possession of heroin, G. L. c. 94C, § 34, and the unlawful possession of heroin with intent to manufacture, distribute, or dispense, G. L. c. 94C, § 32. The hearing on the motion to suppress was directed primarily at the seizure of the handgun that is the basis for the charge under G. L. c. 269, § 10 (*a*). The record does not disclose the circumstances involving the seizure of the heroin. The judge's ruling on the motion to suppress simply ordered that "the fruits of the illegal search are suppressed."

[2]The defendant refers to testimony by Hopewell that he told the police dispatcher that he had seen a "possible weapon." Hopewell also testified that

and the police dispatcher concerning the description of a possible sawed-off shotgun in the car, and proceeded to intercept the car with the expressed intent "to stop and to search the vehicle for a weapon." Officer Wielgosz stopped the car without incident after being joined by Lieutenant Charles DiNapoli and Detective William Lempke of the Holyoke police department. Wielgosz drew his service weapon and ordered the four men in the car to get out while keeping their hands in plain sight. The men did so. Each man was searched for weapons, and no weapon was found. Lt. DiNapoli observed a steering wheel locking device, the "Ultra Club," in the front of the car. Detective Lempke, who also had been informed of a possible sawed-off shotgun in the front passenger side of the car, searched that area after the men had been removed from the car. Lempke found a four-inch by three-inch handgun in the area between the seat cushion and the back support of the front passenger seat. At some point after the men had been removed from the car, Officer DiNapoli said to the defendant, "You got a gun?" The defendant responded, "It's dangerous out there."

Based on these findings of fact, the judge concluded that, "[w]hen Manuel Alvarado, the defendant, exited the motor vehicle at gun point and [was] searched; he was not free to go and [was] effectively [placed] under arrest." The judge went on to conclude that the information furnished to the police by Hopewell was not reliable enough to establish probable cause for the police to stop and search the car in which the defendant was riding. Consequently, the judge suppressed both the handgun and the defendant's statement to DiNapoli as fruits of an illegal search.

In reaching these conclusions, the judge relied on our decision in Commonwealth v. Couture, 407 Mass. 178, cert. denied, 498 U.S. 951 (1990), in which we upheld the suppression of a handgun seized from the defendant's pickup truck based on information received by the police that the defendant had been seen earlier inside a convenience store with a handgun protrud-

---

he could not "recall saying what type of weapon it was on the radio." Officer Wielgosz testified, however, that he was listening to the radio conversation between Hopewell and the police dispatcher and Hopewell observed the object held by the defendant as a sawed-off shotgun. The judge made an express finding on the point, stating in his decision that the term "sawed-off shotgun" was conveyed to the police.

ing from his right rear pocket. In *Couture*, we stated that the stop and subsequent search of the defendant's pickup truck constituted a seizure within the meaning of the Fourth Amendment,[3] *id.* at 183, for which the police needed probable cause, and that the "unadorned fact" that the defendant had been seen in public with a handgun (the carrying of which would not be a crime), "without any additional information suggesting criminal activity, does not give rise to probable cause." *Id.* at 181. We also indicated in *Couture* that the stop could not be justified under the principles of *Terry* v. *Ohio*, 392 U.S. 1 (1968), in the absence of some information that the defendant might be engaged in criminal conduct. *Couture*, *supra*. The judge in this case analogized the circumstances to those in *Couture*, reasoning, in substance, that Hopewell's report of a sawed-off shotgun, unless more detailed and corroborated, would not justify the stop and subsequent examination of the men in the car and the car's interior. The Appeals Court agreed, stating simply in its memorandum and order that, "[t]his case is controlled in all material respects by the decisions in *Commonwealth* v. *Couture*, 407 Mass. 178 (1990), and *Commonwealth* v. *Alvarado*, 423 Mass. 266 (1996)," a case we shall discuss shortly.

2. The issue is whether the police had a constitutionally sufficient basis to stop the car, order the four men out and frisk them for weapons, and then examine the car's interior for a weapon which had been described as a possible sawed-off shotgun. In *Commonwealth* v. *Alvarado*, 423 Mass. 266 (1996), the police received an anonymous tip that several Hispanic men had been seen inside a blue car at a specified address with a handgun wrapped in a towel. The police located and stopped the car with six people inside at the designated address, received permission from the defendant (the driver of the car) to search the car, and found and seized an unlicensed handgun from the car. *Id.* at 267-268. We considered the situation in *Alvarado* (where the defendant's claim was made, as is the case here, under both the Federal and State Constitutions), under the standards developed under art. 14 for an investigatory stop. We described those standards as follows:

"The investigatory stop was justified if the Commonwealth proved that the police had a reasonable

---

[3]The defendant in *Commonwealth* v. *Couture*, 407 Mass. 178, cert. denied, 498 U.S. 951 (1990), appears not to have raised a claim under art. 14.

suspicion, based on specific, articulable facts and reasonable inferences therefrom, that an occupant of the blue motor vehicle had committed, was committing, or was about to commit a crime. *Commonwealth* v. *Alvarado*, [38 Mass. App. Ct. 650,] 652 [1995], citing *Commonwealth* v. *Lyons*, 409 Mass. 16, 18-19 (1990), and *Commonwealth* v. *Wren*, 391 Mass. 705, 707 (1984). See *United States* v. *Hensley*, 469 U.S. 221, 229 (1985); *United States* v. *Cortez*, 449 U.S. 411, 417 (1981). In this Commonwealth, under art. 14, the legality of the stop, that is, the existence of reasonable suspicion, is not determined by the imprecise Federal totality of the circumstances standard but rather by application of the principles stated in determining the existence of probable cause in *Commonwealth* v. *Upton*, 394 Mass. 363, 373-375 (1985) (reliability of informant and basis of his or her knowledge). *Commonwealth* v. *Lyons*, *supra*. 'Because the standard is reasonable suspicion rather than probable cause, a less rigorous showing in each of these areas is permissible.' *Id.* at 19. See *Commonwealth* v. *Willis*, 415 Mass. 814, 819 (1993)."

*Alvarado*, *supra* at 268-269. We went on to conclude in *Alvarado*, in reliance on the analysis about information concerning the sighting of a handgun as set forth in *Commonwealth* v. *Couture*, *supra*, that, "[b]ecause the tip [about the handgun] did not disclose any imminent threat to public safety, we are reluctant to relax our established rule that the report of the carrying of a firearm is not, standing alone, a basis for having a reasonable suspicion of criminal activity." *Alvardo*, *supra* at 271.

We apply these standards to the facts found by the judge in this case to determine on our own whether an objectively reasonable police officer would have been warranted in stopping the car in which the defendant was riding and looking for a specific type of weapon. We conclude that the information received by the police justified their conduct because reliable information that someone might be carrying a sawed-off shotgun stands on a much different footing than a report that someone might be carrying a handgun.

A sawed-off shotgun is an extremely lethal weapon which poses "an ominous threat in and [of] itself." *United States* v. *McKinney*, 477 F.2d 1184, 1186 (D.C. Cir. 1973). The weapon has virtually no legitimate use outside, perhaps, of uses by law

enforcement and military personnel. "Sawed-off shotguns cannot be used against game or wild animals and their only known uses are to frighten or kill human beings." *United States* v. *Reed*, 935 F.2d 641, 643 (4th Cir. 1991). See *Brook* v. *State*, 448 N.E.2d 1249, 1251 (Ind. App. 1983) ("The overall rationale for the legislative ban of sawed-off shotguns centers on their concealability and therefore likely use for criminal purposes rather than for sport or hunting"). While a sawed-off shotgun can be lawfully registered in Massachusetts, "its lawful possession is, in ordinary experience, rare indeed," *United States* v. *Truitt*, 521 F.2d 1174, 1177 (6th Cir. 1975), and "possession of [a sawed-off shotgun] is a serious crime. . . ." *Porter* v. *United States*, 335 F.2d 602, 607 (9th Cir. 1964), cert. denied, 379 U.S. 983 (1965). It is not surprising then to find that numerous courts have concluded that a reliable report about a sawed-off shotgun, by itself, provides either probable cause for the police to conclude that the shotgun may be unlawfully possessed, see *United States* v. *Naugle*, 997 F.2d 819, 823 (10th Cir.), cert. denied, 510 U.S. 997 (1993); *United States* v. *Decoteau*, 932 F.2d 1205, 1207 (7th Cir. 1991); *United States* v. *Melvin*, 596 F.2d 492, 500 (1st Cir.), cert. denied, 444 U.S. 837 (1979); *United States* v. *Bills*, 555 F.2d 1250, 1251 (5th Cir. 1977); *United States* v. *Truitt, supra; United States* v. *Canestri*, 518 F.2d 269, 274-275 (2d Cir. 1975); *United States* v. *McKinney, supra; United States* v. *Story*, 463 F.2d 326, 328 (8th Cir.), cert. denied, 409 U.S. 988 (1972), or reasonable suspicion of illegality and danger justifying an immediate inquiry by the police. See *Porter* v. *United States, supra; State* v. *Bolden*, 380 So. 2d 40, 42 (La. 1980).

While we have no controlling opinion on police investigation of a report about possession of a sawed-off shotgun, the Legislature has taken express cognizance of the highly dangerous nature of a sawed-off shotgun by providing for a sentence of up to life imprisonment for its unlawful possession (or for the unlawful possession of a machine gun). G. L. c. 269, § 10 (*c*). In *Commonwealth* v. *Ghee*, 414 Mass. 313, 320-321 (1993), we held that a sentence of from eighteen to twenty years for unlawful possession of a sawed-off shotgun (consecutive to a life sentence for murder) was not disproportionate to the crime. In *Cepulonis* v. *Commonwealth*, 384 Mass. 495, 499 (1981), appeal dismissed, 455 U.S. 931 (1982), we held that a sentence of from forty to fifty years for the unlawful possession of a

machine gun did not constitute cruel and unusual punishment. We said that "the unlicensed possession of [a] machine gun[] is almost always associated with the commission of violent crimes," *id.* at 497, and went on to say that such a weapon is in "the arsenal of the public enemy and the gangster [with which he] wars on the State." *Id.*, quoting *Rinzler* v. *Carson*, 262 So. 2d 661, 666 (Fla. 1972). The same observations can be made about the unlawful possession of a sawed-off shotgun which the Legislature has classified in G. L. c. 269, § 10 (*c*), as a public danger virtually on the same plane as the unlawful possession of a machine gun. We conclude that a report of the sighting of someone carrying a sawed-off shotgun that meets the constitutional standards set forth in *Commonwealth* v. *Alvarado, supra,* justifies an immediate police response to ascertain the existence and status of the shotgun.

The report received here by the police from Hopewell conformed to constitutional requirements. The information was furnished by a disinterested citizen, who identified himself and relayed his personal observations. See *Commonwealth* v. *Atchue*, 393 Mass. 343, 347 (1984); *Commonwealth* v. *Bowden*, 379 Mass. 472, 477 (1980). Hopewell's description of what he had seen (a "foot to two foot long 'cylinder-ish' pipe which reflected light") fit what the police could reasonably believe was the unique appearance of a sawed-off shotgun,[4] and, in making his emergency report, Hopewell specifically used the term "sawed-off shotgun," instead of a more generic term, such as "gun" or "weapon." Hopewell described the defendant's behavior (slumping over and holding the weapon) in a way that suggested a furtive attempt at concealment.[5] Hopewell also put himself in possible danger by following the car to assist the police in tracking it. Although there was no direct information to show that the men in the car had committed, were committing, or were about to commit a crime, the requirement of nexus to criminal activity is met by the fact that likely possession of a sawed-off shotgun, by itself, discloses an "imminent threat to public safety." *Commonwealth* v. *Alvarado, supra* at 271.

[4]See G. L. c. 140, § 121 ("A 'Sawed-off shotgun' shall mean any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon as modified has one or more barrels less than eighteen inches in length or as modified has an overall length of less than twenty-six inches").

[5]Hopewell also testified, although the judge did not refer to the testimony in his decision, that the defendant "held it [the perceived sawed-off shotgun] in a — in a position, pre-positioned fashion."

The police here possessed a quantum of reliable information which justified stopping the car. That information also justified the police in ordering the four men to get out of the car and, once outside, in frisking them for weapons. *Commonwealth* v. *Vazquez,* 426 Mass. 99, 102 (1997), and cases cited. "It is settled that in appropriate circumstances a *Terry* type search may extend into the interior of an automobile." *Commonwealth* v. *Almeida,* 373 Mass. 266, 270 (1977). The search of the car's interior, and places therein where a sawed-off shotgun (which, by its nature, is compact) could be hidden, was proper, and the discovery and seizure of the handgun flowing from that search was lawful. The probable (after the fact) conclusion, that Hopewell may only have seen the defendant cradling the "Ultra Club," is of no legal significance. The essential question is whether a reasonably prudent person in the position of the police would be warranted in reasonably believing, at the time of the stop and during the subsequent inquiry, that their safety or the safety of others could be in danger. *Commonwealth* v. *Almeida, supra* at 271. This is clearly the case here.

3. The judge concluded that the defendant had been unlawfully arrested when he was ordered out of the stopped car at gunpoint by the police. Based on this conclusion, the judge suppressed not only the handgun, but also the defendant's answer, in response to Lt. DiNapoli's question about the presence of a gun, that, "It's dangerous out there." This response, while ambiguous, could be considered by a fact finder as an admission by the defendant reflecting his knowledge of the handgun, and, if so viewed, the response furnishes some proof that the defendant possessed the weapon.

The governing standard, as we have explained above, was one of reasonable suspicion under which the police were justified in conducting an investigatory stop of the car and the men in it. The armed show of force by the police in ordering the men out of the stopped car, frisking them for weapons, and then examining the interior of the car for weapons did not necessarily place the men under arrest. In a justified stop, as this was, the police may take reasonable precautions to protect themselves and the public, and these precautions will not turn an investigative inquiry into an arrest so long as the force used by the police is commensurate with the extent of the danger. See *Commonwealth* v. *Willis,* 415 Mass. 814, 819-820 (1993). Reliable information that the men may have possessed a sawed-off

shotgun in their car provided the police with ample justification to draw their guns while ordering the men out of the car as a precaution against the use of that weapon by one of the men.

To determine the admissibility of the defendant's statement, it is necessary to know when the defendant was actually placed under arrest or at least in custody, because at that point he would have been entitled to Miranda warnings. See *Commonwealth* v. *Bryant*, 390 Mass. 729, 736 (1984). The testimony at the hearing on the motion to suppress did not establish this fact. Lt. DiNapoli testified that the defendant was not under arrest when he responded to DiNapoli's question. On cross-examination, however, DiNapoli conceded that he asked the defendant about the presence of a gun after the handgun had been seized, and he had focused on the defendant in particular because the defendant had been sitting in the front passenger seat where the handgun had been found.[6] Further proceedings are necessary to decide whether the defendant's statement was elicited in circumstances that required Miranda warnings. In examining this issue, the District Court judge may refer to the principles set forth in *Commonwealth* v. *Morse, ante* 117, 123-124 (1998).

4. The order allowing the motion to suppress is vacated, and a new order is to be entered denying the motion with respect to the handgun. The case is remanded to the District Court for further proceedings on the motion to suppress with respect to the defendant's statement, and such other evidentiary issues that may be encompassed within the motion.

*So ordered.*

---

[6]As we stated recently in *Commonwealth* v. *Morse, ante* 117, 123 (1998), the primary consideration in determining whether a person is in custody for the purposes of Miranda warnings is whether a reasonable person in the position of the individual being questioned would not feel free to leave the place of questioning. Evidence that an investigation had begun to focus on the suspect is material only to the extent that the officer's suspicions influenced the objective perception of the circumstances. *Id.* at 124.