Commonwealth *vs.* William A. Graham & another.[1]

No. 09-P-810.

Suffolk. February 8, 2010. - October 19, 2010.

Present: McHugh, Dreben, & Graham, JJ.

*Firearms. Search and Seizure,* Motor Vehicle, Protective frisk, Container.

A Boston Municipal Court judge erred in allowing two criminal defendants' motion to suppress a firearm found in the locked glove compartment of a motor vehicle that the police had stopped for traffic violations, where the circumstances of the stop (including an officer's observation of one defendant locking the glove compartment) were sufficient to give police a reasonable concern for their own safety, which, in turn, formed a valid basis for the officers' exit order and search of the vehicle's interior. [128-130] Graham, J., dissenting.

Complaints received and sworn to in the Central Division of the Boston Municipal Court Department on August 12 and August 19, 2008.

Pretrial motions to suppress evidence were heard by *Raymond G. Dougan, Jr.,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Judith A. Cowin,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.

*David D. McGowan,* Assistant District Attorney (*Abigail Holland,* Assistant District Attorney, with him) for the Commonwealth.

*Alexandra H. Deal* for Robert Kines.

*Krista M. Larsen* for William A. Graham.

McHugh, J. Following their arrest on firearm and drug charges, the defendants, William A. Graham and Robert Kines, moved to suppress the incriminating evidence, which consisted of

---

[1]Robert Kines.

marijuana found in their pockets and a pistol found in the glove compartment of the automobile Kines was driving when police stopped it for traffic violations. A judge allowed the defendants' motion and the Commonwealth appeals, but only from suppression of the firearm.

We take the pertinent facts from the judge's findings. *Commonwealth* v. *Washington*, 449 Mass. 476, 477 (2007). On those facts, the motion judge found that the exit orders were warranted, but that the officers illegally searched the vehicle's passenger compartment and locked glove box. He also found that the officers had illegally searched the defendants' pockets because their preliminary patfrisk of the exterior of the pockets had not produced anything they recognized as a weapon or contraband.

In appealing suppression of the firearm, the Commonwealth argues, among other things,[2] that the search of the glove box was justified by a reasonable concern for officer safety We agree.

When they first observed the defendants' vehicle, the officers were patrolling a section of Boston in response to recent firearms problems that included a shooting. The officers' attention had been drawn to the defendants when the officers saw a group of people on a sidewalk shrink back and away as the defendants' vehicle slowed while passing them. After stopping the vehicle for traffic violations, the existence of which no one challenges, the officers became aware that a rear seat passenger had a history of firearm-related offenses. Moreover, the officers thought that all of the vehicle's passengers, whom they knew were associated with members of a local gang, "might be involved in firearm related activity." In addition, one of the officers had seen Kines, the driver, lock the glove compartment after retrieving the registration and heard him express concern about leaving his keys behind after he got out of the vehicle. The exit order had been prompted by Kines's refusal to stop reaching down between the seat and the center console after one of the officers told him to keep his hands in sight. A patfrisk of Kines turned up a knife clipped to the side of his jeans and four baggies officers believed

---

[2]The Commonwealth asserts that Graham had not properly established an expectation of privacy in the contents of the glove compartment. Because we dispose of the case on other grounds, we need not address this argument.

contained marijuana. The initial patfrisk of Graham revealed a knife concealed in a sheath inside his waistband. Finally, the officers did not arrest the rear seat passenger whom they knew had been associated with firearms and who surely would have had access to the glove box key Kines had left on the driver's seat when he was taken into custody. Taken together, those circumstances were sufficient to give the officers a reasonable concern for their own safety.

The officers' reasonable concern for safety, in turn, permitted a *Terry*-type search of the vehicle's interior. See *Terry* v. *Ohio*, 392 U.S. 1 (1968). See also *Commonwealth* v. *Pena*, 69 Mass. App. Ct. 713, 718 (2007), quoting from *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974) (search of an automobile is permissible if police are "warranted in the belief that the[ir] safety . . . or that of other persons was in danger"). See generally *Commonwealth* v. *Lopes*, 455 Mass. 147, 161 (2009). That concern was not limited to what the occupants might do while under the officers' immediate control. Instead it extended to threats that might arise from retrieval of a weapon in the vehicle by an occupant who was not placed under arrest. See *Commonwealth* v. *Santiago*, 53 Mass. App. Ct. 567, 571-572 (2002); *Pena*, *supra* at 719. See generally *Michigan* v. *Long*, 463 U.S. 1032, 1051 (1983) ("In this case, the officers did not act unreasonably in [searching the interior of a stopped vehicle] to ensure that there were no other weapons within [the defendant's] immediate grasp before permitting him to reenter his automobile"); *Commonwealth* v. *Lantigua*, 38 Mass. App. Ct. 526, 528 (1995) ("[P]rior to allowing the defendant to reenter the car to obtain the registration, the officers could properly effect a *Terry*-type search of the areas of the car which would be readily accessible to the defendant on reentering").

Contrary to the defendants' argument, the police did not exceed the scope of a permissible protective search by opening the locked glove compartment. The protective search must be limited to what is minimally necessary to dispel safety concerns, and " 'confined in scope to an intrusion reasonably designed to discover' a weapon." *Commonwealth* v. *Moses*, 408 Mass. 136, 144 (1990), quoting from *Silva*, *supra* at 408. If safety concerns necessitate doing so, police may open a closed container. See *Commonwealth* v. *Pagan*, 440 Mass. 62, 72-73 (2003) ("[I]f the

container is such that a patfrisk might suffice to establish that there is no potential weapon within, the container may not be opened as part of a search for weapons unless a patfrisk has first been performed. If, however, a patfrisk would not suffice to dispel suspicion and avert the need for a search, no patfrisk need be performed. In each case, the method and scope of an officer's search for reasonably suspected weapons must be confined to what is minimally necessary to discover the presence or confirm the absence of a weapon"). The glove compartment, which Kines had locked as police approached the car, was large enough to contain a weapon. The keys remained in the vehicle, accessible to any passenger the police released. Under those circumstances, police were entitled to open the glove compartment for the limited purpose of determining whether it contained a weapon.

We likewise reject the defendants' argument that there was no basis for the exit order. To be sure, "[w]hen the police are justified in stopping an automobile for a routine traffic violation, they may, for their safety and the safety of the public, order the driver or the passengers to leave the automobile, but only if they have a reasonable belief that their safety, or the safety of others, is in danger." *Commonwealth* v. *Torres*, 433 Mass. 669, 673 (2001), citing *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 662-663 (1999). In this case, the exit order was justified by essentially the same facts that justified the search of the vehicle's interior. Indeed, the only new information police obtained after the occupants left the vehicle was that Graham had a knife hidden in his waistband.

Insofar as the order required suppression of the firearm discovered in the glove compartment, the order is reversed. In all other respects, the order is affirmed.

*So ordered.*

GRAHAM, J. (dissenting). I respectfully disagree with the majority's conclusion that the motion judge erred in determining that the discovery of the firearm was the result of an illegal search of a motor vehicle and not the result of a valid protective search.

We take the facts from the judge's findings, supplemented by uncontradicted evidence in the record. See *Commonwealth* v. *Colon*, 449 Mass. 207, 214 (2007); *Commonwealth* v. *Scott*, 52 Mass. App. Ct. 486, 492 (2001). At approximately 12:30 A.M. on July 22, 2008, Boston police Detectives Brian Smigielski and Thomas Brooks were patrolling the Fayston Street area of the Roxbury section of Boston, where they had observed an increase in firearm violence that month. As they were standing on the sidewalk in front of 79 Fayston Street, talking to a group of individuals, they observed a car making a left turn from Mascoma Street onto Fayston. The individuals with whom Smigielski and Brooks were speaking retreated toward the steps of 79 Fayston Street when they saw the approaching vehicle. The detectives observed that the car, with four occupants, had a broken driver's side mirror. Neither Smigielski nor Brooks had any information that the vehicle or its occupants were involved in a crime.

Smigielski and Brooks decided to follow the car, which continued down Fayston Street and turned right onto Blue Hill Avenue. The driver failed to signal this turn, and the car's license plate was not illuminated. The car then turned left onto Alaska Street and then right onto Perrin Street, the driver failing to use directional signals on each occasion. The detectives requested the assistance of the BKO1 Unit, Officers McNeil and Dodd. The car they were following, meanwhile, came to a stop at the curb in front of 33 Perrin Street. Smigielski and Brooks pulled behind it, activated the blue lights in their vehicle, and got out with their badges displayed on the breast of their outer garments. At that point, Officers Dodd and McNeil arrived and parked behind the detectives' vehicle. All four officers then approached the car; Smigielski and Dodd were on the driver's side, and Brooks and McNeil were on the passenger side.

As Smigielski and Brooks approached the car, they saw the driver leaning toward the glove box on the passenger side of the car. Smigielski approached the driver's side of the car and saw the operator, Robert Kines, holding the registration in his left hand and locking the glove box with a set of keys in his right hand. Smigielski then requested Kines's license and registration. Kines told Smigielski that he had dropped the keys he was

holding in his right hand onto his lap, as he retrieved his license from his right rear pocket. Kines held his license out for Smigielski, who took it from him. Smigielski asked Kines for his registration, at which time Kines held the registration out toward Smigielski.

Neither Smigielski nor Brooks was familiar with the defendant William A. Graham, who was the front seat passenger. However, Brooks recognized the two rear seat passengers, Greg Altenor and Khyree Thompson. Brooks was aware that Thompson had a history of firearm related offenses, and that Graham, Altenor and Thompson were "associated with individuals from the 'Westville Terrace' neighborhood and based on that thought these individuals might be involved in firearm related activity."

While Smigielski informed Kines of the reason for the stop, Kines placed his hand next to his seat and the center console. Smigielski ordered Kines to keep his hands in sight. Kines again placed his right hand down toward his side, at which point Smigielski opened the driver's side door and ordered Kines out of the car while Kines stated, "I need my keys." Smigielski then pulled Kines out of the car *"as Kines reached for his key."* While conducting a patfrisk of Kines, Smigielski removed from Kines's pockets four small clear plastic baggies containing what he believed to be marijuana and two leather batting gloves, and also removed a knife clipped to the side of his jeans. Then, "[b]ased upon known information about the history of the occupants, the officers ordered the remaining occupants out of the car," and conducted a patfrisk of each one.

During the patfrisk of Graham, Brooks recovered a knife[1] from inside a sheath that was concealed in his left waistband area, and a clear plastic baggie containing what Brooks believed to be marijuana.

The officers then conducted a search of the "passenger compartment of the motor vehicle." Smigielski attempted to open the glove compartment, but it was locked. Smigielski used "the key retrieved from Kines" to open the glove box, and located a black revolver.

In allowing the motion to suppress, the judge specifically

---

[1]Neither Kines nor the defendant was charged with any offense related to the knives recovered by the detectives.

ruled that the exit orders were warranted because, "when an offi-cer's life is at stake, it doesn't take much to justify an exit order." The judge concluded, however, that the search of the car's passenger compartment including the glove box was il-legal because the occupants were pat frisked and neither detec-tive "felt anything that could have been a weapon in the [defend-ants'] pockets. . . . They simply searched the pockets and took out a few small bags of a leafy substance."

*Standard of review.* We accept the motion judge's findings of fact absent clear error, acknowledging that the weight and cred-ibility of testimony is for the judge hearing the motion, but we review independently the motion judge's ultimate findings and conclusions of law. *Commonwealth* v. *Clark,* 65 Mass. App. Ct. 39, 43 (2005). "Our duty is to make an independent determina-tion of the correctness of the judge's application of constitutional principles to the facts as found." *Id.,* quoting from *Commonwealth* v. *Vesna San,* 63 Mass. App. Ct. 189, 190 (2005). "Since the search of the defendant's automobile was conducted without a warrant, the burden was on the Commonwealth to show that it was reasonable under the Fourth Amendment to the United States Constitution." *Commonwealth* v. *Moon,* 380 Mass. 751, 759-760 (1980). "Searches and seizures conducted outside the scope of valid warrants are presumed to be unreasonable. In such circumstances, the burden is on the Commonwealth to show that the search or seizure falls within a narrow class of permissible exceptions." *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 303 (1979).

*Protective search.* Under art. 14 of the Massachusetts Declara-tion of Rights, police officers must have a reasonable apprehen-sion of danger to themselves or others before either a driver or passenger may be ordered from a lawfully stopped motor ve-hicle. *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 662-663 (1999). The police are, of course, entitled to take reasonable precautions for their own safety.[2] "Essentially, the question is whether a reasonably prudent [person] in the [officer's] position

---

[2]In applying hindsight to the officers' actions, this court is mindful that, "as shown by many tragic climaxes to threshold police inquiries, 'the answer might be a bullet.' " *Commonwealth* v. *Silva,* 366 Mass. 402, 407 (1974), quoting from *Terry* v. *Ohio,* 392 U.S. 1, 33 (1968).

would be warranted in the belief that the safety of the police or that of other persons was in danger." *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974). "[I]n appropriate circumstances a *Terry* type search may extend into the interior of an automobile." *Commonwealth* v. *Almeida*, 373 Mass. 266, 270 (1977). Such a search must be limited to what is minimally necessary to dispel safety concerns. See *Commonwealth* v. *Vazquez*, 426 Mass. 99, 103 (1997); *Commonwealth* v. *Alvarado*, 427 Mass. 277, 284 (1998).

Here, the police exceeded the permissible scope of a protective search of a motor vehicle and engaged in an investigatory search, which is prohibited. The case principally relied upon by the majority, *Commonwealth* v. *Pena*, 69 Mass. App. Ct. 713, 718-719 (2007), is inapposite. There we upheld, as a proper protective search, the search underneath an automobile's rear seat cushion where the judge found that a rear seat passenger made repeated furtive gestures with his hands, ignoring orders of the police officers, and the seat cushion where the passenger was sitting was obviously improperly placed.[3]

Here, there were neither furtive movements by the occupants of the car nor were there erratic movements or behavior by them. The driver produced a license and registration for the vehicle, the occupants cooperated in leaving the vehicle, and a patfrisk of the occupants and a search of the interior of the vehicle failed to uncover any weapons or threats to four armed police officers. Given these facts as found by the judge, and fully supported in the record, the judge was correct in concluding that the search of the locked glove compartment exceeded the proper bounds of a protective search.

---

[3]The potential threat to the officers' safety in *Pena* came from the rear seat passenger in a motor vehicle with tinted windows, who continually protested the stop of the motor vehicle and "whose initial willingness to raise his hands at [the officer's] request gave way to a refusal to sit still, erratic movement of his hands, and repeated insistence that [the officers] 'check the trunk.' " *Pena*, *supra* at 719.