NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-262

COMMONWEALTH

vs.

ILM JONES.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The Commonwealth appeals from a Superior Court judge's order allowing the defendant's motion to suppress a firearm recovered after a motor vehicle stop.  The judge concluded that the police exceeded the scope of a permissible protective sweep when they used a knife to pry open the vehicle's locked glove box, where they then found the firearm.  We agree and thus affirm.

Background.  We summarize the judge's factual findings, which are unchallenged on appeal, supplemented by uncontroverted facts in the record, see Commonwealth v. Garner, 490 Mass. 90, 94 (2022), and by our independent observations of the video evidence, see Commonwealth v. Clarke, 461 Mass. 336, 341 (2012).

Boston police officer Jonathan O'Brien was working alone in a marked cruiser on September 25, 2020. Around 1 A.M., O'Brien was dispatched to a nearby residence in response to a homeowner's 911 call about a suspicious person in his driveway. The homeowner reported that, after being alerted to activity on his doorbell camera, he saw a man crouching behind the homeowner's vehicle, seemingly hiding from another vehicle that slowed as it passed the home. Shortly after the 911 call, O'Brien arrived at the home, spoke to the homeowner, and watched the doorbell camera footage. O'Brien saw that the passing vehicle was a dark sedan with tinted windows, but he was unable to determine its make or model.

After unsuccessfully looking for the man seen hiding in the driveway, O'Brien drove in the same direction as the vehicle had traveled on the video footage. Approximately twenty-five minutes after the 911 call, O'Brien spotted a dark sedan with heavily tinted windows. O'Brien ran the license plate and discovered that the registered owner was the defendant, whom O'Brien knew to have a significant firearm history and gang affiliation. O'Brien ran a records search and learned that the defendant had a conviction and several arrests for firearms-related offenses, as well as an arrest for manslaughter. O'Brien also learned that the defendant's driver's license was expired.

After following the vehicle for several minutes, O'Brien decided to effectuate a traffic stop, which occurred without incident. From his position behind the vehicle, O'Brien could see only the silhouettes of the occupants, one in the driver's seat and one in the front passenger's seat. O'Brien watched as the passenger moved forward toward the dashboard area and then settled back into the seat. O'Brien could not see the passenger's hands, nor did he see any movements on the part of the driver or any twisting motions on the part of either occupant.

O'Brien approached the driver's side window and saw that the occupants were two men, later determined to be Terrell Browne, who was driving, and the defendant, who was in the passenger's seat. Each complied with O'Brien's request for their driver's licenses. When O'Brien asked Browne for the vehicle registration, Browne leaned over, revealing a knife in a sheath that was protruding from his back waistband area. After running Browne's license information through the database in his cruiser, O'Brien learned that Browne's license was suspended.

By this time approximately five officers were on the scene. The officers ordered Browne out of the vehicle, pat frisked him, and removed the knife from his person. No other weapons were found on Browne. While this was happening, the defendant avoided eye contact and was "glued" to his phone. After

3

searching Browne, the officers ordered the defendant out of the vehicle and pat frisked him, discovering nothing of significance.

The defendant and Browne were moved to the sidewalk, where they were guarded by some of the officers, while O'Brien and other officers searched the vehicle. As the judge found, and we have confirmed from viewing the body camera footage, this was "a very thorough search that lasted several minutes." In the cup holder, O'Brien found a key fob, which was missing the physical key that should have been inside. O'Brien tried opening the glove box, but it was locked. Based on the lack of pry marks on the glove box, O'Brien believed that it had not been previously opened by any means other than the key. After searching the vehicle for several minutes, discovering nothing of significance, O'Brien used a knife to open the glovebox by less than an inch, revealing the base of a firearm magazine inside. O'Brien then returned to the defendant and found the key to the glove box, along with "house keys or other types of keys," on a key ring in the defendant's pocket. O'Brien used the key to open the glove box and saw a firearm inside.

During the search the officers discussed which canine officer was on duty at the time, and O'Brien also discussed his belief that the defendant's vehicle was the same one from the doorbell camera footage. The tint on the vehicle's windows was

4

eventually determined to be greater than the lawful threshold. See G. L. c. 90, § 9D.  Nevertheless, as the judge found, the officers allowed an acquaintance of the defendant to drive the vehicle away "with no assurance that the tint issue would be addressed."

Discussion.  The only issue on appeal is whether O'Brien was justified in prying open the glove box to confirm the presence or absence of a weapon.  The defendant does not ask us to affirm the judge's decision on alternative grounds; in particular, he does not challenge the propriety of the traffic stop, exit order, or initial protective search of the vehicle.

"An officer who does not have probable cause to search an automobile for evidence of a crime or contraband may nonetheless conduct a limited search for weapons if 'a reasonably prudent [officer] in [the officer's] position would be warranted in the belief that the safety of the police or that of other persons was in danger.'"  Commonwealth v. Daniel, 464 Mass. 746, 752 (2013), quoting Commonwealth v. Silva, 366 Mass. 402, 406 (1974).  The scope of a protective search must be limited to what is minimally necessary to dispel safety concerns.  See Commonwealth v. Amado, 474 Mass. 147, 152 (2016).  In determining whether the police action was minimally necessary, "we must balance the need to make the stop and conduct the search against the intrusion on the defendant."  Commonwealth v.

5

Bostock, 450 Mass. 616, 622 (2008), quoting Commonwealth v. Torres, 433 Mass. 669, 672 (2001). "To be constitutional, an officer's intrusions during [the] stop must be 'proportional to the degree of suspicion that prompted the intrusion.'" Bostock, supra, quoting Commonwealth v. Moses, 408 Mass. 136, 141 (1990) (Moses).

Here, we agree with the judge's conclusion that the intrusion into the glove box exceeded the legitimate scope of a protective search. The sole legal justification for the stop, as the Commonwealth acknowledges, was the excessive tint on the windows. After patfrisks of the defendant and Browne uncovered no weapons other than the knife previously seen on Browne, the officers proceeded to conduct what the judge found to be a "very thorough" search of the vehicle's interior. The body camera footage, which we have reviewed, confirms this. The search lasted several minutes and extended into the back seat, where neither the defendant nor Browne had been sitting. See Commonwealth v. Meneide, 89 Mass. App. Ct. 448, 453-454 (2016) (reasonable safety concerns justified search of area around driver's seat, where defendant had been sitting, but not search of backseat armrest). Despite the thoroughness of the search, the officers did not find a weapon, nor did any additional facts come to light that would have increased the perceived threat to officer safety.

6

Given the judge's factual findings, we see no error in her conclusion that a reasonable officer would not have perceived a safety threat substantial enough to justify using a knife to pry open the glove box. As the judge stated, "[a]t some point the scope of the search goes beyond what is permissible and is a hunt for evidence that goes beyond what the situation calls for." The touchstone, of course, is reasonableness, see Commonwealth v. Rodriguez, 472 Mass. 767, 775 (2015), and here the judge did not err in concluding that the intrusion was not proportional to the need to protect officer safety, considering that the stop was for a violation (the excessive tint) punishable only by a fine, see G. L. c. 90, § 9D, and the officers had already thoroughly searched the vehicle by the time O'Brien pried open the glove box. That the officers discussed which canine officer was on duty further suggests that the search was investigatory, as the judge found. Although the Commonwealth need not show that an officer subjectively felt threatened, the officer's actions at the scene can be relevant to determining whether he had an objectively reasonable safety concern. See Daniel, 464 Mass. at 753 n.2. Cf. Commonwealth v. Alvarado, 420 Mass. 542, 552 (1995) ("use of a canine to aid in the search indicate[d] that the search was investigatory in nature, and not an inventory search"); Commonwealth v. Ortiz, 88 Mass. App. Ct. 573, 577 (2015) (similar).

7

In asking us to reverse the judge's order, the Commonwealth improperly puts forward facts that were not found by the judge and that detract from her ultimate conclusion. See Garner, 490 Mass. at 94. First, the Commonwealth assumes that the defendant's vehicle was the same one recorded by the doorbell camera and from that assumption argues that the officers could reasonably believe that the defendant "was seemingly stalking someone very afraid." But the judge made no findings that support the Commonwealth's assumption; rather, she stated that she was unable to make any observations about the vehicle in the video footage other than that it "appear[ed] to be a sedan and it appear[ed] to be dark colored." We agree with the judge's assessment based on our own review of the footage.

Second, the Commonwealth asserts that the officers reasonably inferred that the defendant locked the glove box "by design" and "ensured that it would stay locked by breaking the key off the key fob." But again, the Commonwealth improperly seeks to supplement the facts to "tip the reasonable suspicion calculus in the opposite direction." Garner, 490 Mass. at 96. Although the judge found that O'Brien saw the defendant "move forward towards the dashboard area and then [come] back to the seat," she did not find that the defendant made any movement consistent with locking the glove box, nor do her findings allow us to draw that inference ourselves on appeal. In fact,

8

O'Brien's testimony, which the judge credited, established that he was unable to see the defendant's hands and he did not see the defendant "reaching." And at no point did O'Brien testify that he believed that the defendant broke the key off the key fob, nor did the judge so find. Instead, O'Brien's uncontroverted testimony was simply that the key, which ordinarily might be stored inside the fob, was not in the fob.

We are also unpersuaded by the Commonwealth's contention that the judge erred by declining to follow Commonwealth v. Graham, 78 Mass. App. Ct. 127, 129-130 (2010), which held that the police properly opened a locked glove box during a traffic stop. We agree with the judge that the facts of Graham are distinguishable. Specifically, there, the officers saw the driver lock the glove box; the driver refused to stop reaching down next to his seat after the officers told him to keep his hands in sight; and, when the driver got out of the vehicle, he left the glove box key on his seat where it was easily accessible to the rear seat passenger, whom the officers knew to be associated with firearms. See id. at 128-129. None of these circumstances are present here. Furthermore, nothing in Graham detracts from the judge's finding that the search in this case was a "very thorough" one lasting several minutes, which went "beyond what the situation call[ed] for."

9

The Commonwealth's reliance on Moses is likewise unavailing.  There, the court held that the police properly searched closed containers stored in the trunk of a vehicle, but that search occurred after the initial protective search.  See Moses, 408 Mass. at 138-139.  During the protective search the police had discovered a loaded handgun and a packet of cocaine, which gave rise to probable cause to search the entire vehicle, including the closed containers in the trunk.  See id. at 145.  The search of the containers, in other words, was part of the investigative search supported by probable cause, not the protective search.  See id.  Thus, as the Commonwealth never claimed in this case that probable cause justified the search of the glove box, Moses provides no basis to reverse the judge's decision.

Order allowing motion to
  suppress affirmed.

By the Court (Shin, Grant &
  Hershfang, JJ.[1]),

Clerk

Entered: October 31, 2025.

---

[1] The panelists are listed in order of seniority.