SUPERIOR COURT 
 
 COMMONWEALTH v s. CHRISTOPHER M. BOYER / COMMONWEALTH v s. ROMUALD BERNAUD

 
 Docket:
 23-164 / 23-188 / 24-95 / 23-192
 
 
 Dates:
 December 13, 2024
 
 
 Present:
 Peter B. Krupp Justice of the Superior Court
 
 
 County:
 NORFOLK, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER ON MOTIONS TO SUPPRESS EVIDENCE
 
 

             Within minutes of a Quincy liquor store employee calling 911 to report an incident involving a gun, the police stopped defendants Christopher Boyer (“Boyer”) and Romuald Bernaud (“Bernaud”) down the street from the liquor store. A pat frisk of Boyer yielded a firearm, and a post-arrest search of vape pens inside a bag Boyer was carrying located drugs. A pat frisk of Bernaud revealed a scale with drug residue, and a canine sniff of Bernaud led to the discovery of other drugs. The police conducted a showup procedure with a witness, who identified the two men as the men who had been inside the liquor store. Boyer is now charged with possession with intent to distribute a Class A and Class B controlled substance, illegal possession of a firearm, and assault with a dangerous weapon. Bernaud is charged with possession with intent to distribute a Class B controlled substance. The Commonwealth nolle prossed a charge against Bernaud for assault with a dangerous weapon.
 
                                                            -1-
 
            Defendants now challenge the lawfulness of the stop and of the searches of their persons and the items they were carrying, and Boyer challenges the lawfulness of the show-up identification. The case came before me on the defendants’ various motions to suppress evidence and Boyer’s motion to suppress the identification. After an evidentiary hearing, during which I heard testimony from Quincy police officers Sean Klimas and Nicholas Rolfsen,1 Boyer’s motions must be denied and Bernaud’s motion must be allowed.
FINDINGS OF FACT
            Based on the preponderance of the credible evidence, and the reasonable inferences that may be drawn therefrom, I make the following factual findings:
            On February 16, 2023, at about 2:35 p.m., “Mike” from Point Liquors on Washington Street in Quincy placed a 911 call.2 Mike reported that “two young black gentlemen were just in” Point Liquors, “started a problem with” his “co-worker,” and “threatened her with a gun.” Mike said that his co-worker could see the gun’s handle in the right pocket of the man who was wearing red pants and a black hoodie. When the 911 operator asked what kind of gun it was, Mike can be heard speaking to the co-worker. The co-worker can be heard in the background of the 911 call, obviously able to hear what Mike was reporting and giving Mike additional
 
--------------------------------------------
 
            [1]        I took evidence on October 7 and 28, 2024, and, after the opportunity for post- hearing briefing, I heard argument on November 22, 2024.
            [2]        I do not know who received the 911 call. Although there was no evidence on the point at the hearing, I generally understand that operators who receive 911 calls are not sworn police officers. See, e.g., Stoneham v. Commonwealth Employment Relations Bd., 87 Mass. App. Ct. 1112, 2015 WL 1311743 at * 1 (Mar. 25, 2015) (Rule 1:28) (town transitioned from uniformed officers to civilians as emergency dispatchers). The Commonwealth did not offer evidence that the 911 operator in question was a police officer or was trained to evaluate reasonable suspicion. I make no findings about the identity, qualifications or training of the 911 operator.
 
                                                            -2-
 
information to pass on to the 911 operator. Mike then told the 911 operator that the co-worker saw the handle and that it was not 100% confirmed that it was a gun.
            A police dispatcher radioed to officers in the area the following: “Two black males in the area of Point Liquors, 230 Washington Street; two black males and one has a weapon, a firearm, tucked in his waistband. Heading toward the Square area from Point Liquors.”[3] The dispatcher did not radio to officers in the field that the 911 caller had reported that either man had shown or brandished a firearm, threatened anyone with the firearm, or committed any crime. The dispatcher also did not direct the responding officers to stop the two men, or to do anything specific, beyond responding to the area.
            At the time of this dispatch, Off. Klimas was at the Quincy District Court, not far from Point Liquors. He heard the dispatch, exited through the back of Quincy District Court, got into his cruiser, and turned onto Washington Street to head toward Point Liquors. He had his radio on as he was responding.
            The 911 operator then asked Mike, who was still on the 911 line, to describe what happened and what the two men did. This conversation between the 911 operator and Mike was not audible to the responding police officers. Mike reported that the two men came into the store and walked around, but when Mike asked for identification, one of the men did not have an identification. When the other store employee said both men needed identification, the two men very rudely said that they would go someplace else, they started mouthing off, and had words with the other store employee. Then, outside the store, one of the two men said something about
 
--------------------------------------------
 
            [3]        The 911 operator’s voice, which can be heard on the 911 call (Exhibit 1), is different from the police dispatcher’s voice, which can be heard on the turret tape (Exhibit 2). I do not know who the police dispatcher was or whether that person was a sworn police officer at the time. No information was admitted about what information the 911 operator provided to the police dispatcher.
 
                                                            -3-
 
a gun and he lifted his shirt showing it in his waistband. The dispatcher did not radio any of this information to the responding officers.
            While Off. Klimas was enroute, an officer asked the dispatcher over the police radio: “Control, no disorder or anything? Somebody just saw a weapon?”[4] The dispatcher did not answer these questions. Instead, the dispatcher stated: “Standby. One of the black males is wearing red pants. The gun is in the waistband. Now they’re walking towards Cagney’s they said off scene.”
            While Mike was still on the 911 call, he could see a police cruiser, which was being driven by Off. Klimas, approaching and then passing the two individuals. There were a number of pedestrians on the street and Off. Klimas did not notice the two individuals when he passed them.
            At about this time, as various Quincy police officers were calling the dispatcher to report that they were responding to the Point Liquors call, an officer asked, “which direction they going?”[5] The dispatcher responded: “In towards the Square. Somebody just drove by them.
They’re by the church on the corner. By the church.” The dispatcher was able to report this to the officers in the field because Mike was reporting his observations of the two men over the 911 line as he and the woman who had encountered the two men in the liquor store were watching them in real time.
            After the dispatcher radioed that a police officer had just passed the two men, Off. Klimas saw the two men matching the description, did a U-turn in the vicinity of 170 Washington Street, and pulled up on the side of Washington Street where the two men were
 
--------------------------------------------
 
            [4]        I do not know if Off. Klimas or another officer posed these questions to the dispatcher. The exchange, however, was at least audible to Off. Klimas while he was responding.
            [5]        I do not know if Off. Klimas asked this question.
 
                                                            -4-
 
situated on the sidewalk. Off. Klimas did not know either man. In responding to the area where the two men were located, Off. Klimas activated the blue police lights on his cruiser, and probably also the siren. Once he pulled up on the side of Washington Street, Off. Klimas quickly exited his cruiser, drew his firearm, pointed it from his chest height at the two men, and told the two men to keep their hands up. Only about 2 minutes and 15 seconds elapsed between Mike placing the 911 call and Off. Klimas arriving on scene and pointing his service weapon at the two men.[6]
            Neither man did anything to give the officers any further suspicion. The men complied with officer instructions. They were not observed to make any furtive or suspicious motions or attempt to flee in any way. The only information Off. Klimas had when he stopped the two men was the information conveyed to him by the dispatcher.
            Other Quincy police officers arrived soon after. Off. Klimas placed the man with the red pants, defendant Boyer, in handcuffs and pat frisked him. Off. Klimas felt a large metallic object in Boyer’s “appendix area,” removed it, and confirmed that it was a firearm. Off. Klimas also removed a fanny pack from Boyer.
            Off. Rolfsen, the second officer on the scene, arrived within a minute of Off. Klimas. He was driving an unmarked vehicle with concealed lights and sirens. He was also a trained canine officer and was traveling with his drug detection dog, Archer. When Off. Rolfsen arrived, Off. Klimas was already dealing with Boyer. Off. Rolfsen heard Off. Klimas say “gun,” meaning Off. Klimas had located a firearm. Off. Rolfsen approached the other man, defendant Bernaud, who was about 20 feet away from Off. Klimas, and placed Bernaud in handcuffs. Off. Rolfsen conducted a pat frisk of Bernaud and felt a hard object in one of Bernaud’s front pockets. Off.
 
--------------------------------------------
 
            [6]        Mike remained on the 911 line the whole time until the police apprehended the two men.
 
                                                            -5-
 
Rolfsen removed the object and found it to be a hard box, which looked like a cigarette box, but was actually a digital scale. Off. Rolfsen popped open the scale, not knowing that it was incapable of holding any other objects, and noticed white powder on the scale.
            After conducting the pat frisk, Off. Rolfsen went to his cruiser and got his dog, Archer. Archer sniffed Bernaud and alerted.[7] As a result, another officer conducted a further search of Bernaud and found multiple plastic bags containing hard rock substances believed to be illegal drugs in the front pockets of the shorts that Bernaud was wearing under his sweatpants.
            After drugs were recovered from Bernaud, Off. Klimas went to Point Liquors and spoke to Mike Mulvey, who made the 911 call, and Taylor Duke (“Duke”), the Point Liquors employee who interacted with the two men. Off. Klimas arranged to have Duke participate in a showup identification procedure. Off. Klimas could see the two men, who were with 5-6 police officers, from where he was outside Point Liquors. Off. Klimas read Duke the Instruction Card for Show Up ID Attempt (Exhibit 3), then she got into the passenger seat of Off. Klimas’ cruiser and they drove slowly (about 15 miles per hour) past the two individuals who were each handcuffed and standing about 25 feet apart with uniformed police officers in close proximity to them. Other police cruisers were approximately 20 feet away from where the two men were situated. Duke immediately identified Boyer and Bernaud as the two men who had been in Point Liquors.
            Off. Klimas transported the items seized from Boyer and Bernaud back to the Quincy police station. Quincy Police Department’s policy required an inventory of any seized property, including the contents of sealed containers.[8] During the process of preparing an inventory of the
 
--------------------------------------------
 
            [7]        Off. Rolfsen also had Archer sniff Boyer. Archer did not alert around Boyer.
            [8]        The inventory policy contained within Order 91-63 (Exhibit 5) states in relevant part: “The Wagon Officer shall take possession of a prisoner's property, articles of value and all of their personal property so that it may be protected and restored to the detainee upon release.
 
                                                            -6-
 
fanny pack seized from Boyer, Off. Rolfsen found two items designed to look like vape pens (one white and one brown), which Off. Rolfsen could tell were not vape pens, and in which he could hear items jiggling around. When he popped open the tops of the devices, he found additional contraband.
DISCUSSION
I.  The Stop of the Defendants
            A police officer may stop (or seize) a person on the street if, at the time of the stop, the officer has “reasonable suspicion that the person was committing, had committed, or was about to commit a crime.” Commonwealth v. Martin, 467 Mass. 291, 303 (2014). In analyzing the
constitutionality of a stop, the court must first determine whether and when a stop occurred, and then evaluate whether there was “reasonable suspicion” at the time to support the stop.
Commonwealth v. Meneus, 476 Mass. 231, 234 (2017).
            A. T he Time of the Stop
            A stop or seizure occurs if “an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay.” Commonwealth v. Matta, 483 Mass. 357, 362 (2019). “Whether an encounter between a law enforcement official and a member of the public constitutes a noncoercive inquiry or a constitutional seizure depends upon the facts of the particular case.” Id. at 363.
            Off. Klimas stopped defendants on Washington Street in Quincy when he responded with his police lights flashing, did a U-turn on Washington Street and pulled up near the defendants,
 
--------------------------------------------
 
Any container(s) shall be opened and contents inventoried; any container(s) locked or otherwise secured shall be opened with key or by any means necessary, and the contents inventoried. All items including evidence and contraband shall be recorded during the booking procedure. All personal items taken and listed in the booking record, except contraband and evidence, shall be placed in an envelope and secured in the prisoner property lockers located within the booking area.” (Italics in original).
 
                                                            -7-
 
exited his cruiser with his firearm drawn, pointed the firearm at the defendants, and ordered them to put their hands in the air. These actions by Off. Klimas communicated to defendants, and would have communicated to any reasonable person in defendants’ position, that they were not free to leave and that Off. Klimas would use his power to compel them to stay. See, e.g., Commonwealth v. L opes, 455 Mass. 147, 155 (2009) (officer drawing weapon and pointing it toward stopped van constituted stop); Commonwealth v. Smigliano, 427 Mass. 490, 492 (1998) (officer activating blue lights constituted stop). Accord Commonwealth v. Bannister, 94 Mass. App. Ct. 815, 819 (2019) (“parties agree that the defendant was seized when [officer] ordered him to the ground at gunpoint”).
            B.  Reasonable Suspicion
            The second question in analyzing the lawfulness of the stop is whether, at the time of the stop, the police had reasonable suspicion to justify the stop.
1. T he Information Known to the Responding Officer
            When Off. Klimas responded with his gun drawn, he, himself, did not have reasonable suspicion to justify the seizure. Off. Klimas received a dispatcher call about two individuals walking along Washington Street, one of whom had a firearm in his waistband. The simple fact that a person has a firearm does not establish reasonable suspicion to believe he has committed or is about to commit a crime, Commonwealth v. DePeiza, 449 Mass. 367, 373 (2007) (“observations suggesting a concealed firearm, with nothing more, do not provide reasonable suspicion for a stop”); Commonwealth v. Barros, 435 Mass. 171, 177 (2001) (“anonymous tip
that someone is carrying a gun does not, without more, constitute reasonable suspicion to
 
                                                            -8-
 
conduct a stop and frisk of that individual”), even if the firearm is not securely holstered.[9] Commonwealth v. Couture, 407 Mass. 178, 179-181 (1990) (handgun in rear pocket); Commonwealth v. Winam, 2024 WL 4579286 at * 2 (Mass. App. Ct. Oct. 25, 2024) (Rule 23.0 decision) (defendant reportedly seen placing gun “in his pants”); Commonwealth v. Scott, 99 Mass. App. Ct. 1104, 2020 WL 7490058 at ** 1-3 (Dec. 21, 2020) (Rule 23.0 decision) (defendant carrying firearm in “the back of his waistband area” inside liquor store).
            Although reasonable suspicion may be established when information about a concealed weapon is “coupled with other factors,”[10] DePeiza, 449 Mass. at 373, there were no “other factors” known to or observed by Off. Klimas. The only information Off. Klimas had was that two black males were in the area and the one with red pants had a firearm in his waistband. Off. Klimas had no knowledge of any altercation or disturbance, saw no furtive or sudden movements or attempts to flee, and the time of day and location did not suggest criminal activity. To the contrary, when Off. Klimas pulled up, defendants were fully cooperative. Off. Klimas did not notice anything that would give him any suspicion. If the lawfulness of the stop had to be analyzed based only on what Off. Klimas knew at the time of the stop, the stop would be unlawful due to a lack of reasonable suspicion and its fruits would have to be suppressed.
 
--------------------------------------------
 
            [9]        If properly licensed, it is lawful to possess a firearm while walking on the street. Stopping a person for being in possession of a firearm, without more, is like stopping any person on the street for driving a car simply because the person driving may not have a driver’s license.
            [10]      See, e.g., Commonwealth v. Dasilva, 66 Mass. App. Ct. 556, 560-561 (2006)
(prior knowledge of defendant’s illegal possession of firearm, defendant’s motion of his hand toward waistband, and his flight from police). Compare, e.g., Commonwealth v. Haskell, 438 Mass. 790, 793-794 (2003) (publicly loading firearm at 2 a.m. in high crime area supported reasonable suspicion), with Commonwealth v. DeJesus, 72 Mass. App. Ct. 117, 120 (2008) (observation in mid-afternoon supported conclusion that reasonable suspicion lacking).
 
                                                            -9-
 
2. T he Collective Knowledge Doctrine
            The court’s analysis, however, is not necessarily limited to the information known to the responding officer. The collective knowledge doctrine – also known as “the fellow officer rule” – allows, in various specific circumstances, knowledge of other officers to be considered in assessing whether there was reasonable suspicion to justify a stop. See, e.g., Williams v. United States, 308 F.2d 326, 327 (D.C. Cir. 1962) (Burger, J.) (collective knowledge doctrine first provided that “[w]hen the police department possesses information” that would support a police action (e.g., a stop or a warrantless arrest), the officer taking the police action, “if acting under orders based on that information, need not personally or first hand know all the facts”).
            Here, the only relevant facts known to anyone associated with law enforcement were gathered exclusively by the 911 operator, and there is no evidence that the 911 operator passed those facts on to anyone else other than describing the clothing of the two individuals and that the man with red pants was believed to have a gun in this waistband. No police officer had any information about any threats or arguments, or any other relevant information bearing on the reasonable suspicion analysis.[11] Therefore, the threshold question is whether information known to the 911 operator, but not communicated to any police officers, may be considered in determining whether there was reasonable suspicion for Off. Klimas to stop the defendants.
            There is a dearth of authority in Massachusetts on the question of whether information known to a 911 operator that is not passed on to responding police officers may be considered in determining whether the police had reasonable suspicion to make a stop. In this regard, I am bound by a single broad statement in a recent decision by the Appeals Court, which predates
 
--------------------------------------------
 
            [11]      Off. Klimas’ observations of the two men walking on the sidewalk in the general area described served to corroborate innocuous details provided to the 911 operator, but did not raise or support any further suspicion.
 
                                                            -10-
 
Commonwealth v. Privette, 491 Mass. 501 (2023), see, infra, at 12-14, and which the Appeals Court asserted without analysis. The case of Commonwealth v. Westgate, 101 Mass. App. Ct. 548 (2022), involved a 911 call to a “Dartmouth police dispatcher” about an apparent “drunk driver.” The Appeals Court analyzed the information the 911 caller provided to law enforcement under the Aguilar-Spinelli framework, see, infra, at 16, and, at the close of its discussion of the legal standard, sweepingly stated: “Under the ‘collective knowledge’ doctrine, the judge considers the contents of the 911 call, even if not repeated by the dispatcher in the broadcast.” Westgate, 101 Mass. App. Ct. at 551 (emphasis added). 
            There are a number of reasons to distrust this broad statement in Westgate as accurately stating the law in Massachusetts, at least to the extent it suggests that substantive information “not repeated by the dispatcher in the broadcast” may be considered even when the broadcast does not disclose the nature of any alleged offense to be investigated. Id. First, the broad statement is dicta. In Westgate, the dispatcher called out to police officers in the field “that a ‘possible OUI’ was being committed by a white Mercedes traveling on Route 6 westbound, giving its license plate number and noting that the 911 caller was following it [the white Mercedes].” I d. at 500. This broadcast reasonably allowed police officers in the field to infer that the 911 caller had personal knowledge from first-hand observations, and had seen activity by the Mercedes consistent with a possible OUI.[12]
            Second, the broad statement in Westgate is presented in conclusory fashion and without analysis or application of the collective knowledge caselaw. There is no indication in Westgate that either party challenged application of the collective knowledge doctrine either before the
 
--------------------------------------------
 
            [12]      In contrast, the dispatcher in this case did not radio to the responding police officers any indication that either of the two black men had committed any crime with or without the use of the firearm that was reportedly in the possession of the man in the red pants.
 
                                                            -11-
 
Appeals Court or the District Court.[13] The Appeals Court did not rely on the doctrine in reaching its decision, nor did it discuss the training of the 911 dispatcher or whether the dispatcher was a sworn police officer.
            Third, the only authority that Westgate cites for its broad statement is Commonwealth v. Perez, 80 Mass. App. Ct. 271, 274 (2011). But Perez does not stand for the proposition cited and, in fact, did not present a collective knowledge issue at all. Rather, the Appeals Court in Perez had to assess the basis of knowledge of two 911 callers “based on the officers’ testimony about the information that they received from dispatch.” 80 Mass. App. Ct. at 275. Because the evidence consisted of what the officers recalled hearing from the dispatcher, there was no issue of whether the dispatcher had additional facts from the caller. Although it is not addressed, the Westgate panel perhaps assumed that if the Perez panel had had all the recordings, it would have considered all the information known to the 911 operator; but, of course, such matters were not before the Appeals Court in Perez.
            Fourth, the court in Westgate relies heavily on Lopes, citing it for the proposition that “[w]here a police radio broadcast directs an officer to make an investigatory stop of a vehicle, the stop is lawful only if the Commonwealth establishes both the particularity of the vehicle’s description and indicia of the reliability of the transmitted information.” Westgate, 101 Mass. App. Ct. at 551, citing Lopes, 455 Mass. at 155. This proposition is true of course, as far as it goes, but it does not eliminate the need for the police to have reasonable suspicion. Indeed, the reference to “transmitted information” is to the information transmitted to police officers in the field, and it is implied that that information would have to be sufficient to constitute reasonable
 
--------------------------------------------
 
            [13]      Instead, it appears the defense in Westgate only challenged the adequacy of the informant information provided to the 911 operator. See Westgate, 101 Mass. App. Ct. at 549; Commonwealth v. Westgate, 1933CR2850, “Memorandum of Decision on Defendant’s Motion to Suppress” (Docket #5) (Ovoian, J.). Accord Id., “Motion to Suppress” (Docket #3).
 
                                                            -12-
 
suspicion. Lopes, 455 Mass. at 157 (to show particularity, “the Commonwealth must show that the description provided sufficient detail to allow the police officer relying on the radio transmission reasonably to suspect that a motor vehicle matching the description was occupied by a person or persons who committed the crime under investigation”) (emphasis added). Indeed, in L opes, as a result of information provided by a Boston police officer, a Brockton police detective caused the following broadcast to be sent out to Brockton police officers: “Brockton cruisers, be on the lookout for dark brown tinted van. Cape Verdean flag in the back of it. It’s the only information we have. Homicide in Boston today by handgun, dark brown tinted van, Cape Verdean flag in the back. Stop and hold. Use caution.”[14] 455 Mass. at 154.
            Finally, factoring into the reasonable suspicion calculus information known to, but not transmitted, by a civilian 911 operator, does not fit into either of the established categories under the collective knowledge doctrine. The collective knowledge doctrine generally has two forms that may be used to determine whether reasonable suspicion exists: vertical or horizontal collective knowledge.[15] Privette, 491 Mass. at 508.
            Vertical collective knowledge, like the scenario in Lopes, 455 Mass. at 154, “involves one officer directing or requesting another officer to conduct a stop.” Privette, 491 Mass. at 508. The typical example is the so-called “wanted poster” issued by one police department and relied on by a police officer in another department. See, e.g., United States v. Hensley, 469 U.S. 221 (1985). Even if the police officer who relies on the wanted poster does not have the facts
 
--------------------------------------------
 
            [14]      The relevant discussion in Westgate, 101 Mass. App. Ct. at 551, also relies on Commonwealth v. Depiero, 473 Mass. 450 (2016). In Depiero, a police dispatch to a responding officer gave the responding officer a reasonable basis to believe a crime had been committed. Id. at 453 (“erratic driving”).
            [15]      The Supreme Judicial Court has recognized that “not all fact patterns will necessarily fall squarely within either the vertical or horizontal framework.” Commonwealth v. Privette, 491 Mass. 501, 509 (2023).
 
                                                            -13-
 
supporting reasonable suspicion, she may rely on the poster and her stop will be lawful if the officers who issued the wanted poster had reasonable suspicion to justify stopping the defendant. Hensley, 469 U.S. at 232. With regard to vertical collective knowledge, courts review the validity of a stop “based on the directing officer’s knowledge.” Privette, 491 Mass. at 508.
            Although this case presents some aspects that resemble the vertical model – the dispatcher directed officers to respond – it is not clear that the 911 operator who received the information was a sworn police officer or that the 911 operator passed all the information from the 911 call on to the police dispatcher; the dispatcher did not alert officers in the field that any crime had been committed or was about to be committed; and the dispatcher did not direct the police officers to do anything in particular besides alerting them to a man with a gun in his waistband and asking them to respond. The responding officers were not directed to stop, detain, frisk, or arrest the man in question.
            Horizontal collective knowledge “permits the aggregation of information known to multiple officers” in determining whether reasonable suspicion exists in the situation when “officers are not acting at the direction of another, as they would be under the vertical collective knowledge doctrine.” Privette, 491 Mass. at 508. The Supreme Judicial Court recently clarified the situational requirements for applying the horizontal collective knowledge doctrine:
Where there is no directive or instruction from a superior officer, in order to aggregate officers’ knowledge for use in the determination of reasonable suspicion without running afoul of art. 14, the officers must be involved in a joint investigation, with a mutual purpose and objective, and must be in close and continuous communication with each other about that objective.
Id. at 513. Here there was no joint investigation, there is no indication that the 911 operator was a police officer or was in communication with officers in the field, and the various police officers
 
                                                            -14-
 
involved did not have different pieces of information; instead, all of the relevant information was in the possession of the 911 operator.[16]
            Although it appears that the broad statement in Westgate does not accurately state the law before, and certainly after, Privette, no appellate court has overruled, clarified, or limited it. I am bound by the decision in Westgate, and feel compelled to follow its dictates that under the collective knowledge doctrine I must “consider[ ] the contents of the 911 call,” even though those contents were not transmitted to any police officers in the field. 101 Mass. App. Ct. at 551.
 
--------------------------------------------
 
            [16]      Federal courts appear unwilling to consider information only known to a civilian 911 operator as part of the reasonable suspicion analysis. A Second Circuit decision, United States v. Colon, 250 F.3d 130 (2d Cir. 2001), is on all fours with this case. In Colon, a 911 dispatcher received a call from a woman stating that a man had struck her in the head with a gun and provided a description of the man with the gun. Id. at 132. The 911 operator alerted a police dispatcher of a crime in progress, but only identified the location, a description of the suspect, that the suspect had a firearm, and that the information had come from an anonymous caller. Id. The dispatcher in turn directed officers to respond to the location for a “man with a gun case” and provided the man’s description. In ruling that the fruits of the search must be suppressed, the Second Circuit distinguished the Supreme Court’s vertical collective knowledge cases, ruling that “by not tracing the information back to any person with the training to make a determination of reasonable suspicion and relying instead on the collective knowledge of ‘the department’ generally, the government’s argument takes the collective knowledge doctrine too far afield of the reasons underlying its purpose.” Id. at 135. The record in Colon, as in the instant case, contained no evidence that the 911 operator was trained or otherwise capable of determining whether reasonable suspicion for a stop existed. Id. at 137. Contrasting cases in which responding officers could rely on the knowledge of a prosecutor or auxiliary officer, the Court of Appeals concluded that “[i]mputing information known only to the civilian operator and not conveyed to the dispatching and then arresting officers would extend the [collective knowledge] doctrine beyond its current jurisprudential parameters and vitiate the privacy safeguards of the Fourth Amendment.” Id. Accord United States v. Eymann, 962 F.3d 273, 284 (7th Cir. 2020), quoting Colon, 250 F.3d at 137 (“Collective knowledge [ ] applies to information that an officer receives from those with the ‘training, responsibility or authority to make a determination of reasonable suspicion.’”). See also United States v. Fernandez-Castillo, 324 F.3d 1114, 1118 (9th Cir.) (information known to state Highway Patrol dispatcher, who received information from Montana Department of Transportation dispatcher, “properly considered as part of our analysis of reasonable suspicion”), cert. denied, 540 U.S. 959 (2003).
 
                                                            -15-
 
3. T he Existence of Reasonable Suspicion
            The information that Mike gave to the 911 operator, although it was not communicated to the responding officers, was sufficient to establish reasonable suspicion to believe the two men had committed a crime involving a gun. According to Mike, after they were denied service at Point Liquors, the two men began arguing with a Point Liquors employee, one referenced a gun, and then the man with the red pants raised his shirt to reveal a gun tucked into his pocket or waistband. This information, if sufficiently reliable, established reasonable suspicion to believe the two men had at least threatened to commit a crime in violation of G.L. c. 275, §§ 2, 4. See also G.L. c. 265, § 15B(b) (assault by means of dangerous weapon); G.L. c. 272, § 53 (disorderly conduct).
            The question here is whether the information from Mike was sufficiently reliable. To establish the reliability of information from a 911 caller, “the Commonwealth must show the basis of knowledge of the [911 caller] (the basis of knowledge test) and the underlying circumstances demonstrating that the [911 caller] was credible or the information reliable (veracity test).” Depiero, 473 Mass. at 454 (internal quotations omitted), applying the familiar formulation from Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969).
            Here, the 911 caller, Mike, gave his first name and his employment with Point Liquors. This was sufficient information to identify the caller. Mike described a fast-moving situation that had just occurred (the two men in question remained within view during the 911 call), much of which he said he personally witnessed. To the extent he was relaying information from another employee, it was clear that the other employee was there with Mike at the time of the 911 call; the events in question had just occurred; the other employee, although not identified specifically,
 
                                                            -16-
 
was easily known to the police because she was identified as the other employee on duty at Point Liquors with Mike at the time; and she was providing additional details to Mike to relay to the 911 dispatcher. Moreover, certain facts conveyed by Mike during the 911 call (the clothing and appearance of the two males and their location) were corroborated by the police once they responded almost immediately. These details are sufficient to meet both the basis of knowledge and the veracity tests. Armed with reasonable suspicion based on reliable information, the police stop of both Boyer and Bernaud was lawful.[17]
II.  The Patfrisks
            “During a stop for which there is constitutional justification, . . . a patfrisk is permissible only where an officer has reasonable suspicion that the suspect is armed and dangerous.” Commonwealth v. Torres-Pagan, 484 Mass. 34, 36 (2020). Accord Id. at 38-39. Here, the 911 operator had information that the defendants had just threatened an employee at Point Liquors with a gun, and the responding officer had information that the man with the red pants had a gun in his waistband. This information was sufficient to support Off. Klimas’ well-grounded fear that the man with the red pants was armed and potentially dangerous. His patfrisk of Boyer was lawful.
            The patfrisk of Bernaud is more problematic. The police may not automatically search the companion of a person who has been lawfully arrested. Commonwealth v. Ng, 420 Mass. 236, 237-238 (1995). Instead, while Bernaud’s companionship with Boyer, who had been lawfully detained and found to be in possession of a gun, is one factor that may be considered, the frisk of Bernaud is only constitutionally permissible “if the arresting officer can point to specific, articulable facts that warrant a reasonable suspicion that” Bernaud “might be armed and
 
--------------------------------------------
 
            [17]      The Commonwealth does not argue the police had probable cause to arrest either defendant at the time of the stop. Accordingly, I do not analyze the issue.
 
                                                            -17-
 
a potential threat to the safety of the officer or others.” Commonwealth v. Sweeting-Bailey, 488 Mass. 741, 753 (2021) (quotation and citation omitted).
            As to Bernaud, there was nothing more than association or companionship. Even if I consider the information known to the 911 operator, the police had insufficient information to give rise to a reasonable suspicion that Bernaud was armed and dangerous. The 911 operator had information that the defendants exchanged words with the liquor store employee and, in that context, the man with the red pants (Boyer) showed a gun. There was no information provided to the 911 operator to suggest that the other man, Bernaud, possessed any weapon, referenced a weapon, or necessarily knew that Boyer was in possession of a weapon prior to Boyer raising his shirt. Moreover, as Off. Rolfsen was arriving at the scene, he heard Off. Klimas say “gun,” indicating that Off. Klimas had found a firearm on Boyer’s person, exactly where the 911 caller said it would be. There was no reason to believe, at least by that point, that Boyer had handed his gun off to his compatriot. Bernaud was fully cooperative with the police, did not attempt to flee, did not blade his body, or reach for any part of his clothing or anatomy, or attempt to conceal anything. Other than his companionship with someone who was believed to possess, and then was found to be in possession of, a firearm – which is itself insufficient, Ng, 420 Mass. at 237- 238 – there was no reason to suspect Bernaud was armed in any way or dangerous. Off. Rolfsen’s patfrisk of Bernaud was unlawful and the fruits of the patfrisk, including the fruits of the dog sniff,[18] must be suppressed.[19]
 
--------------------------------------------
 
            [18]      The canine sniff of Bernaud followed discovery of the scale and the white power on the scale, giving rise to Off. Rolfsen’s belief that Bernaud may otherwise be in possession of drugs. The sniff would not have occurred without the discovery of the scale and the residue on it. As a result, the fruits of the canine sniff are the direct results of the unlawful patfrisk.
            [19]      The Commonwealth does not argue that the patfrisk of Bernaud was lawful incident to his arrest for anything that transpired at or outside Point Liquors. See
 
                                                            -18-
 
III.  The Showup Identification Procedure
            Showup identifications are inherently suggestive and have been widely criticized. Commonwealth v. Martin, 447 Mass. 274, 279 (2006) (“[o]ne-on-one identifications are 
generally disfavored”); id. at 291-312 (Cordy, J., dissenting). In analyzing the constitutionality of the showup identification, the focus is largely on law enforcement expediency or “necessity,” deferentially defined; and secondarily on the way the showup was conducted. A defendant may challenge a showup identification if (I) the police lacked a good reason for using the procedure, or (ii) the procedure used “needlessly adds to the suggestiveness” of an ordinary showup and renders the identification “conducive to irreparable mistaken identification.” Commonwealth v. Crayton, 470 Mass. 228, 235-236 (2014) (internal quotations omitted).
            In this instance there was good reason for the police to use a showup identification procedure and little chance of an erroneous misidentification.[20] First, the police were responding to a call for two men roughly matching the description of the defendants who had threatened a liquor store employee, one of whom had a firearm concealed in his pants, which firearm had been shown during an argument (or an exchange of words) with the liquor store employee. There were concerns about public safety and the police had an interest in conducting an efficient investigation. See, e.g., Commonwealth v. Dunne, 73 Mass. App. Ct. 1104, 2008 WL 4790614 at *2 (Nov. 5, 2008) (Rule 1:28 decision) (showup not unnecessary given concern for public safety following breaking and entering). Moreover, the showup was conducted very close in time to the
 
--------------------------------------------
 
Commonwealth’s Opposition to Defendants Motion to Suppress the Stop, Frisk, and Show Up Identification at 5-6 (Docket #16 in Case No. 23-192).
            [20]      An identification is also of limited probative utility in this case. The principal charges in these cases involve the possession of drugs and a firearm. No identification by Duke is required, or even relevant, to those charges. An identification is really only relevant to the charges of assault by means of a dangerous weapon as to which Duke is the named victim.
 
                                                            -19-
 
crime. See, e.g., Commonwealth v. Rivera, 91 Mass. App. Ct. 796, 800-801 (2017). While any showup is inherently suggestive, the circumstances here – defendants standing with their hands cuffed among police officers – are consistent with numerous cases in which no special element of unfairness has been found. See, e.g., Commonwealth v. Dew, 478 Mass. 304, 310 (2017).
Finally, there was little risk of misidentification in this case because the percipient witness, Duke, had had the two men under continuous observation during the 911 call and until the two men were stopped by the police.[21]
IV. The Inventory Search of the Vape Pens
            Finally, Boyer challenges the opening of the purported vape pens in the context of an inventory search of the contents of the fanny pack taken from Boyer during the stop, and searched at the Quincy police station after Boyer’s arrest. See generally Illinois v. Lafayette, 462 U.S. 640, 647-648 (1983). The Commonwealth introduced evidence of the Quincy’s police inventory policy, see, supra, at 6-7 n.8, which Off. Rolfsen followed. Recognizing that the items that appeared to be vape pens were not actually vape pens, Off. Rolfsen was authorized under the Quincy policy to open those items to make sure to inventory their contents. There was nothing unlawful in the inventory search of those items and the detection of contraband therein.
ORDER
            Boyer’s Motion to Suppress Evidence Obtained from Warrantless Search and Seizure (Docket #10 in Case No. 23-164, and Docket #5 in Case No. 23-188) and his Motion to Suppress
 
--------------------------------------------
 
            [21]      To the extent Boyer seeks to suppress an in-court identification by Duke, that portion of the motion is also denied. Given my findings above, allowing evidence of Duke’s out- of-court showup identification, and in light of the fact that Duke’s identification was unequivocal, there is no constitutional impediment to the Commonwealth seeking to have her make an in court identification. Dew, 478 Mass. at 310-315, discussing Commonwealth v. Collins, 470 Mass. 255, 259-267 (2014).
 
                                                            -20-
 
Identification (Docket #12 in Case No. 23-164, and Docket #2 in Case No. 23-188) are both
DENIED.
Bernaud’s Motion to Suppress (Docket #9 in Case No. 23-192) is ALLOWED.